| | | |
|---|---|---|
| IN RE: | ) | |
| JEFFERSON COUNTY, ALABAMA, | ) | |
| a political subdivision of the State of Alabama, | ) | Case No.: 11-05736-TBB |
| | ) | |
| Debtor. | ) | Chapter 9 |

| | | |
|---|---|---|
| THE BANK OF NEW YORK MELLON, | ) | |
| as Indenture Trustee, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | AP No.: 12-00016-TBB |
| | ) | |
| JEFFERSON COUNTY, ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

## Amended Memorandum Opinion On Net Revenues
## And Applicability of 11 U.S.C. § 928(b)

This declaratory judgment action is the reaction of The Bank of New York Mellon and those joining it as plaintiffs to a stance taken by Jefferson County, Alabama (hereinafter sometimes the County). The stand taken by the County is that the monthly withholding of millions of dollars that had not been, to the degree and scope now argued by the County, if at all, part of the calculus in determining how much of its sewer system's revenues are to be paid to warrant holders who/which lent to the County over a period of years $3,685,150,000.00. This litigation has been necessitated by actions taken by the County within days of January 2012 rulings by this Court. One was that the filing of the County's chapter 9 bankruptcy case effectively ended an Alabama court's receivership control over the County's sewer system properties. The Alabama court's receiver's control over the properties constituting the County's sewer system that had commenced in September 22, 2010, was in question from the November 9, 2011, County bankruptcy filing until this Court's January 6, 2012, ruling on the receiver's status. So, effectively, the County did not regain possession and control over the sewer system until sometime in early to mid-January 2012.

Cash and the ability to obtain it is perhaps one of the most critical needs of any enterprise, private or governmental. Without cash or ready access to it, even consistently profitable companies may not be able to survive over time. The obverse is that with cash or access to it even businesses that perennially lose money may continue to operate while continuing to lose more money. This adversary proceeding highlights some of the problems faced by the County. Its sewer system is an enterprise with large flows and stores of monies, but limited access to

them.[1]  The limited access is partly due to the contractual agreements, the County's default under the agreements, and the excessive debt incurred to fund rehabilitation and improvements to its sewer system.  Many of the reasons for its sewer system's limited access to cash are the fault of prior commissioners and employees of the County.  Others are the results of missteps by individuals and businesses involved in the funding and construction of the improvements and enhancements of the sewer system.  This is the backdrop of this suit.  An initial task is to set the contours of the disputes.

### I.  Declarations, Categories, Revenues, And Outcomes

The Bank of New York Mellon, as indenture trustee (hereinafter Indenture Trustee), along with Bank of America, N.A., Bank of Nova Scotia, Société Générale, New York Branch, The Bank of New York Mellon, State Street Bank and Trust Company, Lloyds TSB Bank PLC, JPMorgan Chase Bank, N.A., Syncora Guarantee Inc., Assured Guaranty Municipal Corporation, and Financial Guaranty Insurance Company are plaintiffs in this declaratory judgment action against Jefferson County, Alabama.  The Indenture Trustee along with the other named plaintiffs are collectively referred to as the Trustee.

As amended, the Trustee's complaint contained five counts.  Three of the counts were severed by the Court and designated as a new adversary proceeding.  The counterclaims of the County were severed along with the Trustee's three counts.  The two remaining ones are counts I and II, which revolve around a fight over what expenditures for the County's sewer system are payable ahead of payments to those lenders who/which secured payment of interest and principal owed on the County's sewer system's warrants by obtaining a consensual lien against some revenues of the sewer system.

Count I is for a declaration that the contracted for scheme for how revenues of the County's sewer system are to be applied controls, that a bankruptcy subsection allowing subordination of contracted for payments of the kind at issue here is inapt, and that the County may not withhold payment of monies falling into certain categories of disputed expenditures.  Count II is an alternative request. Should a portion of the bankruptcy laws for municipal bankruptcies allow subordination of the contracted format for payments to holders of warrants of the County's sewer system, the Trustee seeks a ruling that the disputed categories of expenditures are not part of what is to be paid ahead of principal and interest on the warrants.  The monies that

---

[1] The stores of cash appear to be potentially in excess of $200,000,000.00.  As of the end of fiscal year 2011, The Bank of New York Mellon, as indenture trustee, held in various accounts and funds over $188,000,000.00 which includes about $74,700,000.00 in at least four construction funds.  All of these monies are claimed as restricted by The Bank of New York Mellon, as indenture trustee.  In addition to these and as of the end of fiscal year 2011, there was another $58,600,000.00 in what is referenced as "Released Escrow Funds" held by the County. The information made available to the Court indicates that the "Released Escrow Fund" has dwindled to somewhere in the range of $35,000,000.00 to $45,000,000.00 as of the end of April 2012.  Based on information supplied during the various hearings before the Court, the monies held by The Bank of New York Mellon, as the indenture trustee under the indentures governing the warrant borrowings by the County, appear to not have significantly changed.

the County asserts are payable ahead of disbursements to warrant holders have been classified by the Trustee and the County.

According to the parties there are six general categories of expenditures that are in dispute.  As designated by the County and Trustee, they are (1) maintenance expenditures, (2) project expenditures, (3) other expenditures, (4) professional fees and related costs, (5) reserves for depreciation/amortization and future operating and/or capital expenditures, and (6) extraordinary items.  The maintenance expenditures are for keeping the sewer system in good repair and good operating condition.  Included within this category are expenditures for maintenance of the sewer system's existing collection system, i.e., pipes, manholes, and its plants and pumping stations.  The County and the Trustee disagree on what are project expenditures. The Trustee asserts they are those expenditures that expand, modernize, update, or improve the sewer system, including those incurred to meet regulatory requirements and industry standards that expand, modernize, update, or improve the sewer system.  The County contends project expenditures are those required to comply with regulatory requirements or industry standards and whether they expand, modernize, update, or improve the County's sewer system is irrelevant to whether they are properly payable ahead of warrant holders.

Other expenditures are those described in the "Joint Statement with Respect to April Hearing" (hereinafter the Joint Statement) as expenditures "on all other items," including for vehicles and equipment to replace worn, lost, or destroyed vehicles and equipment and expenditures for what the parties call internal labor.  Joint Statement at 4.  Internal labor is labor performed by employees of the sewer system.

Professional fees and related costs is the next category and it is subdivided into two types. One is comprised of those professional fees and costs directly related to the efficient and economical administration of the sewer system exclusive of those related to the County's chapter 9 bankruptcy case.  For instance, included are fees and costs incurred in defending against claims arising from the termination of a sewer system employee.  This subclass of professional fees is not in dispute and all parties agree that they are properly payable ahead of payments to warrant holders.  The second is the disputed one.  It is all other professional fees.  This subclass includes, but is not limited to, the County's professional expenditures for lawyers and others associated with its chapter 9 case "including both negotiation and litigation."  *Id.*  This disputed subcategory of professional fees and costs entails mostly those associated with the County's chapter 9 case including litigation and negotiation of matters arising after its November 2011 municipal bankruptcy filing.  Part of the disagreement on whether these are payable from revenues that would otherwise be available to pay the sewer system's warrant obligations is whether the disputed professional fees and costs are directly related to the sewer system's efficient and economical operation.  Another part is whether they are extraordinary items within the sixth category of contested expenditures.

The category for what the parties call reserves for depreciation and amortization along with those for future operating and/or capital expenditures relates to what are monies withheld

Case 12-00016-CRJ    Doc 151    Filed 10/09/12    Entered 10/09/12 11:57:55    Desc Main
Document    Page 3 of 43

for (a) estimated future expenditures that may be incurred in some future time for each of the four earlier categories already described, plus (b) a calculation of an estimated amount of depreciation and amortization of the sewer system's assets. In any given period of time, this category does not entail any expenditures of monies. Rather, depreciation and amortization are non-cash items that under generally accepted accounting principles are part of operating expenses. *See* Government Accounting Standards Board Statement No. 34 (hereinafter GASB 34); *see also* Plaintiffs' Brief in Support of Counts I, II and V of Their Amended Complaint for Declaratory Judgment at 44-47 ("[D]epreciation and amortization may properly be accounted for as 'operating expenses' under GAAP . . . ."); Jefferson County's Trial Brief Regarding Appropriate Postpetition Net Revenues Payable to the Trustee at 4-5 (hereinafter County Trial Brief) ("[D]epreciation and amortization . . . are universally recognized as operating expenses under generally accepted accounting principles."). The reserve for future expenditures is what it says it is: deducting monies from current period revenues for estimated future expenditures. The Trustee's position is that under the contract between it and the County, only expenditures incurred and for which payment is due in the current month or a prior month reduce the amount of sewer system revenues that are available for servicing the debt owed to warrant holders. For various reasons, the County disagrees.

The last category is extraordinary items as they are determined under generally accepted accounting principles. At this time, the majority of monies in question is an estimated amount of $833,333.00 per month for professional fees and costs of the County, which it attributes as chargeable against revenues of the sewer system. The Trustee contends they are not because they are extraordinary items under generally accepted accounting principles, and, as a result, are not a deduction from sewer system revenues before payments of interest and principal owed to the County's sewer system's warrant holders.

The dispute between the County and the Trustee over the categories of maintenance expenditures, project expenditures, and other expenditures is straightforward. The Trustee maintains that under the contract documents, those that are chargeable to a fixed capital account under generally accepted accounting principles are not expenditures payable ahead of the warrant holders. For each of these three categories, the County contends that there is no such limitation. Although not expressed in the Joint Statement, the Trustee implicitly takes the position that any items in professional fees and related costs, reserves for depreciation and amortization and for future operating and/or capital expenditures, and extraordinary items that, under generally accepted accounting principles are also properly chargeable to a fixed capital account, are not under the contracted for scheme reductions in the amount of monies that are to be used for repayment to holders of sewer system warrants.

In addition to the disagreement over how the expenditures within these six categories are to be treated under the contract documents and under the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, the Trustee and the County are at odds over the scope of inquiry this Court should make into each of the categories. The County's position is that it should be only category-by-category and not the item-by-item details of what is in each classification. The Trustee does not seek a

4

line-by-line review of all expenditures within each category, but does want a review of some such as those professional fees and related costs associated with the County's chapter 9 bankruptcy case.

In the later part of January 2012, notification was sent by the County to the Indenture Trustee that the County was withholding revenues for December 2011 and January 2012 that are asserted to be either included as expenses under the governing contractual provisions or under a particular subsection of the Bankruptcy Code, 11 U.S.C. § 928(b). The first of the two sets forth that $7,351,378.00 was being withheld to create a reserve for future expenditures of the sewer system plus a monthly amount representing a ten year estimated amount in lieu depreciation and amortization.[2] On top of this sum, another $1,666,666.00 was being deducted from revenues that otherwise were payable to the Indenture Trustee for the benefit of the warrant holders. This represents professional fees and expenses of the County for December 2011 and January 2012 which, in large part, are fees and expenses attributable to or arising in or from matters associated with the County's bankruptcy case. The aggregate of these two sums is $9,018,044.00.

The added amount that the County argues is properly deductible before remitting monies for payment of interest and principal on warrants is quite large by any measure. It is also a sum that exceeds, on average, a little over $4,500,000.00 per month increase in deductions from revenues otherwise dedicated to pay warrant holders. During the time the sewer system was controlled by an Alabama court's receiver, approximately fourteen months, the County pushed $4,500,000.00 average monthly increase is greater than the total monthly amount of the Indenture determined operating expenses paid by the receiver to keep the system operational and in good condition. Put another way, it is an amount that is more than a one hundred percent increase in what these expenses had been during the state court receivership period. By comparison and on average, the County's asserted increase in the operating expenses of the sewer system takes the total average monthly operating expenses to about ninety-two percent higher than they had been for the two fiscal years prior to the state court receivership period.

The County's notification letters make clear that for future months similar sums would be part of the expenditures for which the County contends it is authorized, under either the Indenture or a bankruptcy code subsection, to either pay or withhold from its sewer system's revenues. Although there may be some variation in the precise amounts that might be allocated within each of the six categories for future months, the aggregate sum of the monthly amounts for the six contested categories of expenditures will not vary. This is because all of the fought

---

[2] This calculation was done due to the County's realization that use of depreciation based on the County's sewer system's books and records, currently in the range of $130,000,000.00 per year or up to a little over $10,800,000,000.00 per month, results in no monies ever being available to repay the sewer system's warrant indebtedness. One of the County's notification letters sets forth that "if we used the depreciation and amortization numbers from . . . [the County's exhibit] (between $128 million and $130 million per year, meaning between $10-$11 million per month), there would be nothing to remit [to the Trustee for debt service]." In lieu of this, the County calculated what it called a reserve by making a ten year estimate of "costs of maintaining the system and keeping it compliant with state and federal environmental laws and regulations." Trustee Ex. P-13.

5

over dollars are based on estimates for (a) professional fees and expenses, and (b) the reserve for future expenditures plus depreciation and amortization. This is made clear by the contents of one of the County's notification letters: $3,675,689.00 per month is for depreciation, amortization, and reserves for other future items plus $833,333.00 per month for professional fees. Thus, the only variability would have to come from a modified calculation of these estimated amounts.

More importantly, the January 20, 2012 letter giving notice of the withholdings demonstrates that regardless of which of the six categories the estimated sums may be allocated to, the reality is that only two categories are involved in the dispute. One is the $3,675,689.00 which is estimated depreciation and amortization that supposedly includes a reserve for future expenditures. The other is $833,333.00 for estimated future professional fees and expenses. These classifications do not entail payment of any monies in a given month. Similarly, they do not represent an incurred obligation of the sewer system in a given, current month or any prior month.

All of this needs to be viewed from the historic background of the period during which the warrant indebtedness was incurred to today, which is over fifteen years. During this period, the County's sewer system has operated, maybe not perfectly, but at a better overall level of service than before the warrant base debts were incurred. It has also generated revenues sufficient to pay all of the operating expenses as defined under the Indenture and have monies available for payment of interest and principal on the warrants.

Until January 2012, the consistent practice of the County and the Indenture Trustee shows that the items in what the County calls a reserve, its proxy for depreciation and amortization, has never been treated as an expenditure that decreases what is to be paid for interest and principal on the warrants. When it comes to the estimate for professional fees, no such estimated amount has prior to 2012 been withheld by the County for professional fees and expenses. To the extent that some or all of these estimated professional fees and expenses are exclusively related to the County's chapter 9 case, their previously not having been estimated is understandable. Before preparing for a filing of a bankruptcy case, there would have been no reason for such an estimate. Also part of the history that complicates resolution of issues in this adversary proceeding is that the last rate increase by the County's sewer system occurred in 2008.[3] Not having rate adjustments to the extent specified in the Indenture was one of the reasons the Alabama court appointed a receiver for the County's sewer system. *In re Jefferson Cnty., Ala.*, 465 B.R. 243, 255-56 (Bankr. N.D. Ala. 2012). Should rate increases have been implemented, it has also deprived the sewer system of needed additional revenues.

If the County prevails on its position for how the revenues from its sewer system are to be applied under its classification of properly recognized expenditures, the impact on the warrant holders is dramatic. Over the course of twelve months, it reduces monies that could have been

---

[3] A more detailed history of the County's path to bankruptcy and its sewer system related debts is set forth in *In re Jefferson Cnty., Ala.*, 465 B.R. 243, 250-58 (Bankr. N.D. Ala. 2012).

used to pay principal and interest to them in the approximate amount of $54,000,000.00. During the course of what may be the time it takes to achieve a hoped for approved plan of adjustment of the County's debts, the amount is potentially well above $100,000,000.00.

Heightened importance to this amount of reduction in revenues payable to warrant holders' claims comes from the structure of the indebtedness used to finance the sewer system's rehabilitation and improvement. It is not a general obligation of the County and no lien exists, *see In re Jefferson Cnty., Ala.*, 465 B.R. at 265, against the physical assets making up the sewer system. The only source of monies dedicated to repayment of the sums borrowed is expressly limited under the terms of the contract documents to revenues of the sewer system after payment of what are essentially the costs and expenses of operating and maintaining the sewer system.

Should the County succeed in this case, there is one outcome from this sort of revenue based financing that will happen and another that is a potential. The one that will occur is a delay in payments to warrant holders to a later date from what would otherwise have been earlier. This imposes costs on warrant holders in the form of added risk of nonpayment and the opportunity costs associated with any time delay. It also assumes that the second outcome does not occur.

The second arises from any change in the contracted payments to warrant holders that might occur should 11 U.S.C. § 1129(b)(1)-(b)(2)(A) & (B) be applicable and utilizable by the County as part of its plan of adjustment of debts. *See* 11 U.S.C. §§ 901(a), 1129(b)(1)-(b)(2)(A) & (B). Basically, the County's contract's terms' posture regarding the six disputed categories, if correct, results in an approximate $54,000,000.00 per year further decrease in the revenue stream available for sewer system warrant based debt repayment. For any present valuation of this reduced revenue stream, the decrease in value, whatever it may be, caused by the County's contract based argued allocation for expenditures is likely in the hundreds of millions of dollars, if not more. The point of this discussion is that should the second potentiality become a reality, the delay in payment may be truncated by a plan of adjustment of debts in a fashion that results in the loss of some of what would otherwise have been ultimately received by the warrant holders. These outcomes show why the distribution of the County's sewer system's revenues under the Indenture, or as modified under § 928(b) of the Bankruptcy Code, are of moment to all parties to this lawsuit.

Resolving the contract classification of expenditures payable ahead of monies to be applied to payment of the sewer system's warrant indebtedness and whether a provision of the bankruptcy laws allows alteration of the contracted flow of sewer system revenues encompasses knowing what is meant by two phrases and where they have importance. One is "necessary operating expenses" and the other is "operating expenses."

7

## II.  Distinctions Of A Kind–An Ancestral Overview

Each of "necessary operating expenses" and "operating expenses" is a progenitor of the dispute before the Court.  One is in a statute.  The other is in a contract.  What is included within each meaning and how they compare are essential to resolution of this adversary proceeding.

"Necessary operating expenses" are words contained in § 928(b) of the Bankruptcy Code, 11 U.S.C. § 928(b), that sometimes allow modification of the impact of 11 U.S.C. § 928(a)'s retention of certain pre-bankruptcy consensual liens on revenues from, among other sources, the ownership, operation, or disposition of projects or systems such as Jefferson County's sewer system.  To the extent that the contractual agreements do not permit payment of those costs and expenses encompassed within "necessary operating expenses" ahead of interest and principal payments to the warrant holders, 11 U.S.C. § 928(b) may modify the contracted for flow of monies that would otherwise occur so that these "necessary operating expenses" are paid prior to payment of interest and principal owed on the secured obligations.  Essentially and in some instances, § 928(b) is designed to cause the subordination of a consensual lien on those revenues defined as "special revenues" under § 902(2) of the Bankruptcy Code to payment of costs and expenses determined to be what is designated as "necessary operating expenses" under 11 U.S.C. § 928(b).

A portion of the disagreements arises from "necessary operating expenses" being undefined in the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*  The County envisions "necessary operating expenses" expansively as including certain expenditures for assets that under generally accepted accounting principles are capitalized, reserves for anticipated future expenditures for capitalized and non-capitalized items, and other non-expenditure items, such as depreciation and amortization.  The Bank of New York Mellon in its capacity as trustee under the trust indenture dated as of February 1, 1997, by and between Jefferson County, Alabama and the Bank of New York Mellon's predecessor trustee, AmSouth Bank of Alabama (hereinafter the Indenture) and the other parties to this lawsuit do not view its scope as broadly and assert that § 928(b)'s priming of payments of principal and interest to warrant holders comes into play only in the context of a consensual lien on special revenues involving all revenues of the system or project, a gross revenue pledge (hereinafter a gross revenue pledge), and not a consensual lien on special revenues remaining after payment of operating expenses, which is referred to as a net revenue pledge (hereinafter a net revenue pledge).[4]

Other aspects of the contest originate from the phrase, "operating expenses" and how it is defined in the Indenture.  Under the Indenture's structure, placement of costs and expenses within "operating expenses" causes them to be paid ahead of distributions of interest and

---

[4]  Net revenue pledges come in varying forms.  The range is from one that is a pledge of revenues after payment of all costs and expenses to one that pays some, but less than all costs and expenses.  This matter of degree of payment of costs and expenses that are operating expenses under any definition, be it contractual or statutory, has significance when § 928(b)'s subordination of pledged special revenues is at issue.  *See infra* Part V.B.(3)-V.D.

Case 12-00016-CRJ    Doc 151    Filed 10/09/12    Entered 10/09/12 11:57:55    Desc Main
Document    Page 8 of 43

principal to holders of outstanding warrants issued by the County under the terms of the Indenture and eleven supplemental indentures entered into between 1997 and 2003.[5]  As one might surmise and despite "operating expenses" being defined in the Indenture, there are differing interpretations by the County and the Trustee over what is included within "operating expenses" under the Indenture's definition (hereinafter the Operating Expenses).  The County reads Operating Expenses as more inclusive than does the Trustee.  The County's interpretation of Operating Expenses is so broad that it contends that reference to what is contemplated by the Indenture's provisions resolves how payment of the disputed special revenues is to occur.  The County insists that under its view of Operating Expenses 11 U.S.C. § 928(b) does not come into play.

From an analytical perspective and although for different reasons, the County and the Trustee urge that resolution of the flow of special revenues received by the sewer system may be accomplished by reference to the Indenture without knowing § 928(b)'s scope.  Accepting this joint position requires, among other things, agreeing with the proposition that all pledges of special revenues that are not gross revenue pledges are not subject to § 928(b)'s standard – the Trustee's position – and that Operating Expenses includes expenditures that are capitalized and cash flow items that are not expenditures – part of the County's stance.  It is accurate that each of these necessitates analysis of Operating Expenses under the Indenture.  However, both still require knowing when § 928(b) is to be applied which, of necessity, means understanding what is contemplated by "necessary operating expenses."  For this reason and in the context of this case, the Court does not agree that this declaratory judgment action may be resolved without knowing the when of applicability of and the what of that which is contemplated by "necessary operating expenses."

As has been outlined, how Jefferson County sewer system's "special revenues" are to be paid is the focal point of the disagreements between the County and the Trustee.  Resolution of what costs and expenses of the County's sewer system are to be paid ahead of payments to warrant holders entails a comparison of what the Indenture brings within Operating Expenses and what is envisioned by § 928(b)'s "necessary operating expenses."  This comparison requires consideration of the scope of and the underlying purpose for 11 U.S.C. § 928(b)'s subjecting certain consensual liens on special revenues to payment of "necessary operating expenses" along with knowing how "special revenues" are treated under the Indenture.  The initial focus is on the terms contained in the Indenture.

### III.  The Contracted Apparatus
### A.  Definitions And The Flow

Under the Indenture, the County granted a consensual lien via section 2.1 against (a) "System Revenues that remain after payment of Operating Expenses," but excluding revenues

---

[5]  Incorporated as part of each supplemental indenture is the definition of "operating expenses" as it is determined in the Indenture.

Case 12-00016-CRJ    Doc 151    Filed 10/09/12    Entered 10/09/12 11:57:55    Desc Main
Document      Page 9 of 43

received from a sewer tax and other taxes that are a portion of the System Revenues, (b) monies required to be deposited in a debt service fund and a reserve fund along with investments, reinvestments, income, and proceeds of such monies, and (c) all monies and properties transferred to or otherwise acquired by the Indenture Trustee as additional security. The System Revenues against which a lien has been granted by the County to secure repayment of the warrant holders is defined in section 1.1 of the Indenture as Pledged Revenues. The parties also reference the Pledged Revenues as Net Revenues.

System Revenues is defined in section 1.1 as:

> [R]evenues derived from the Sewer Tax and all revenues, receipts, income and other moneys hereafter received by or on behalf of the County from whatever source **derived from the operation** of the [sewer] [s]ystem, including, without limitation, the fees, deposits and charges paid by users of the [sewer] [s]ystem and and interest earnings on the Indenture Funds (other than the Rate Stabilization Fund) and any other funds held by the County or its agents that are attributable to or traceable from moneys **derived from the operation** of the [sewer] [s]ystem, but excluding, however, any federal or state grants to the County in respect of the [sewer] [s]ystem and any income derived from such grants.

(Emphasis added). This definition causes only revenues received or derived from operation of the County's sewer system to be part of what is System Revenues plus those received from the Sewer Tax which is also defined in section 1.1, and interest earnings, if any, from four of the five Indenture Funds.[6] Indenture § 1.1 at 13.

Comparison of the revenues against which a lien is created under section 2.1 of the Indenture with the definition of System Revenues under section 1.1 reveals that the lien against revenues of the County's sewer system, the Pledged Revenues, is not necessarily equal to the full amount of what is included in System Revenues. For instance, it is less by the amount of any Operating Expenses as defined under section 1.1, the Sewer Tax as identified in section 1.1, and other undefined tax revenues that are part of System Revenues.[7] It suffices for purposes of this

---

[6] Indenture Funds is defined as meaning the Debt Service Fund, the Rate Stabilization Fund, the Depreciation Fund, the Reserve Fund, and the Redemption Fund. Indenture § 1.1 at 5.

[7] There is a caveat not applicable to what this Court needs to decide in this adversary proceeding. Some of the revenues that are excluded from the lien created under part I of section 2.1 of the Indenture or by the section 1.1 definition of System Revenues may become subject to the lien by the additional security provision of part III of section 2.1 or other means.

10

Court's analysis of the contract terms to (a) learn what are Operating Expenses under the contractual agreement between the County and the Indenture trustee, and (b) know that Pledged Revenues have been and will remain less than System Revenues.

Operating Expenses are specified for the applicable period or periods to mean:

> (a) **the reasonable and necessary expenses of efficiently and economically administering and operating the [sewer] [s]ystem**, *including, without limitation, the costs of all items of labor, materials, supplies, equipment (other than equipment chargeable to fixed capital account), premiums on insurance policies and fidelity bonds maintained with respect to the [sewer] [s]ystem (including casualty, liability and any other types of insurance), fees for engineers, attorneys and accountants (except where such fees are chargeable to fixed capital account) and all other items*, except depreciation, amortization, interest and payments made pursuant to Qualified Swaps, **that by generally accepted accounting principles are properly chargeable to expenses of administration and operation and are not characterized as extraordinary items**, (b) the expenses of maintaining the [sewer] [s]ystem in good repair and in good operating condition, but not including items that by generally accepted accounting principles are properly chargeable to [a] fixed capital account, and (c) the fees and charges of the Trustee.

Indenture § 1.1 at 9 (emphasis added). It is not disputed that Operating Expenses under the Indenture are made up of (a) reasonable and necessary expenses for the efficient and economical administration and operation of the sewer system, (b) expenses of maintaining the sewer system in good repair and in good operating condition, and (c) fees and charges of the Indenture Trustee. The contest is over the makeup of the first two of these categories. What is included or not in these categories of Operating Expenses is of importance to the warrant holders and the County because of the Indenture prioritization of how the System Revenues are to be applied.

The sequence in which these revenues are to be applied is detailed in Article XI of the Indenture. A special account called the Jefferson County Sewer System Revenue Account (hereinafter the Revenue Account) has been established to receive all System Revenues and all amounts received by the County pursuant to certain swap agreements.[8] On or before the last

---

[8]  A portion of the revenues that would otherwise be required to be deposited into the Revenue Account are permitted to be held in another account or accounts until expended for the uses or purposes intended. These are monies received by the sewer system as grants, borrowed funds, deposits and certain payments by contractors, and

Case 12-00016-CRJ    Doc 151    Filed 10/09/12    Entered 10/09/12 11:57:55    Desc Main
Document      Page 11 of 43

business day of each calendar month, the County is required to apply monies in the Revenue Account first to payment of all Operating Expenses "that are then due and that were incurred during the then-current or in any then-preceding calendar month." Indenture § 11.1.

Of the monies in the Revenue Account, those that were received from the Sewer Tax are to be used first to pay the Operating Expenses. Following exhaustion of the Sewer Tax revenues, any remaining incurred and then due Operating Expenses from the current or any preceding month are to be paid from the residual funds in the Revenue Account. When the due, incurred, and unpaid Operating Expenses from the current and preceding months have been fully paid, any remaining monies in this account are to be paid in a specific priority.[9] They are to go first into the Debt Service Fund to the extent and on the dates specified in section 11.2, second into the Reserve Fund (also designated the Debt Service Reserve Fund) at the times and amounts specified in section 11.3,[10] then into the Rate Stabilization Fund as specified in section 11.4, next into the Depreciation Fund as determined under section 11.5, followed by and to the extent allowed under section 11.6 to Surplus Revenues as defined in the Indenture, and lastly into the Redemption Fund as set forth in section 11.7. Should there be insufficient monies in the Revenue Account in any given month to fully pay what is required to be placed into the Debt Service Fund, no monies are to be paid into any of the other Indenture Funds given lower priority under section 11.1. Similarly, a shortfall in monies to meet the requirements for payments into one of the Indenture Funds lower in priority than the Debt Service Fund results in no monies being paid during a given period into those others even lower in section 11.1's priority scheme.

At this time, having sufficient monies to fully fund payment of the Operating Expenses along with the required deposits into the Debt Service Fund and the Reserve Fund is, at best, problematic. Having monies to fund other of the Indenture Funds remains elusive, if not unattainable, during many, if not most or all, months. Without revenue increases from a rate

---

customer deposits. Indenture § 11.1. The existence of these other accounts and the ultimate disposition of funds in these accounts does not impact on the resolution of the issues currently before the Court.

[9] Pledged Revenues is not necessarily the balance of the System Revenues left in the Revenue Account after payment of Operating Expenses. It may be in some months that it is and in others that it is not. For any given period and due to the possible inclusion of monies in the Revenue Account that are not subject to the lien and pledge granted under section 2.1 of the Indenture, the balance of the Revenue Account after payment of Operating Expenses that are also Pledged Revenues may be either equal to or less than the remaining Revenue Account balance. This is not a factor cited by the parties in their disputes. However, the County has taken the position in its brief that monies "not within one of these grants [those of Indenture section 2.1] are not subject to the Trustee's lien and are not sources from which the County's non-recourse obligations can or should be satisfied." County Trial Brief at 14. The County is correct that such monies are not subject to section 2.1's grant unless within the three categories of grants of section 2.1. It is incorrect that monies not subject to the lien provisions of section 2.1 are not and should not be available to pay the "County's [sewer system's] non-recourse obligations." The Sewer Tax and certain other taxes are excluded from the lien grant of section 2.1, but are System Revenues that are required to be applied to pay Operating Expenses. Indenture §§ 1.1 at 13; 11.1.

[10] There is also a Subordinate Debt Fund. Its existence and how it is funded does not alter the required analysis or resolution of the disputes among the parties.

increase or other sources along with enhanced operational efficiencies and other means of reducing costs, this state of affairs will not change.

Knowing the composition of Operating Expenses, what are Pledged Revenues, and how System Revenues are applied under the Indenture reveals some of the reasons underlying the County's and the Trustee's positions regarding Operating Expenses. Those costs and expenses that are Operating Expenses are not Pledged Revenues: the lien is only on System Revenues remaining after payment of Operating Expenses. Indenture § 2.1. As is discussed later in this memorandum opinion, the Indenture categories of Operating Expenses, Pledged Revenues, and System Revenues affect whether and the extent to which 11 U.S.C. §§ 922(d), 928(a) & 928(b) are applicable to some of the System Revenues.

Perhaps of more importance to the warrant holders is that each dollar increase in the amount of sewer system revenues used to satisfy Operating Expenses results in an equal reduction in monies available to pay interest and principal on the warrants. Somewhat differently, the ability of the County to appropriately pay or charge as Operating Expenses those costs and expenses that it might otherwise fund from its non-sewer system revenues, in particular professional fees arising from or related to the chapter 9 case, frees these other sources of County revenues for other purposes. At this point, the Court needs to note that there is no evidence that the County has or intends to use any of the System Revenues or other sums pledged or dedicated to the its sewer system for any other purposes. For both the Trustee and the County and stated in a different way than previously, whether System Revenues are used to pay Operating Expenses or become Pledged Revenues may (1) impact (a) any valuation of either the stream of revenues generated by the County's sewer system or (b) the County's sewer system, and (2) affect how the claims of the warrant holders are treated under any restructuring of the County's indebtedness.

How Operating Expenses and Pledged Revenues are determined under the Indenture takes on added meaning when one focuses on the non-recourse nature of the County's sewer system's warrant obligations and that the County did not become generally liable for any aspect of what it agreed to under the Indenture. *See In re Jefferson Cnty., Ala.*, 465 B.R. at 265. For the warrant based financing of its sewer system, the non-recourse, non-general obligation nature of the sewer system's indebtedness is a requisite of Ala. Code §§ 11-28-1 *et seq.* (1975) when it comes to warrants that are not general obligations of a municipality and is confirmed by, among others, the witnesseth paragraph on the first page of the Indenture, sections 2.2 and 18.1 of the Indenture, along with section 3 of 1997 resolution of the Jefferson County Commission approving and authorizing the execution and delivery of the Indenture and issuance of certain of the warrants.

All of this non-recourse, non-general obligation status of the County's sewer system warrant based indebtedness and obligations has been recited by the County to this Court as support for its position in this declaratory judgment action. A distinction needs to be drawn for purposes of some of the arguments by the County in this adversary proceeding. It is accurate that the sole recourse of the warrant holders for payment of what they are owed is the revenues of the

13

sewer system. It is as true that none of the obligations agreed to by the County under the terms of the Indenture, including all supplemental indentures and all of the warrants issued pursuant to each, are not by the Indenture's provisions made general obligations of the County. However, this is decidedly different from whether the County may be liable for some of its sewer system's obligations independent of the Indenture's provisions. Indeed, a close reading of the Indenture demonstrates that the limitations relating to the non-recourse nature and its obligations not being general obligations of the County are with reference to making sure that the debt limitations imposed under Alabama law are not exceeded and no mention is made of when, if ever, the County may be liable for obligations incurred independently from those also agreed to under the Indenture. This, too, is accurate regarding the scope of Ala. Code § 11-28-2 (1975). *See, e.g.*, Indenture §§ 2.2, 18.1; ALA. CODE § 11-28-2 (1975).

### B. Performance And The Whole
### (1) Distributions And Definitions Revisited: Operating Expenses Do They Matter?

Although the County relies on the non-recourse, non-general obligation standing of its Indenture based obligations, the analysis at this point is of what was agreed to under the Indenture. In doing such an examination, a cardinal rule is that the contract needs to be viewed as a whole. *Vankineni v. Santa Rosa Beach Dev. Corp. II*, 57 So. 3d 760, 763 (Ala. 2010). Another is that the course of performance by the parties to a contract may be used to construe a contract. *See, e.g.*, *Chevron U.S.A., Inc. v. United States*, 20 Cl. Ct. 86, 87-89 (Cl. Ct. 1990); *Flavor House Prods. Inc. v. Int'l Nut Alliance, LLC*, 2012 WL 2339757, at *7 (M.D. Ala. June 19, 2012); *Marshall Durbin Farms, Inc. v. Fuller*, 794 So. 2d 320, 325 (Ala. 2000); *see also, e.g.*, *Brooklyn Life Ins. Co. v. Dutcher*, 95 U.S. 269, 273 (1877) ("The practical interpretation of an agreement by a party to it is always a consideration of great weight. The construction of a contract is as much a part of it as anything else. There is no surer way to find out what parties meant, than to see what they have done."); *Noell v. Am. Design, Inc. Profit Sharing Plan*, 764 F.2d 827, 832 (11th Cir. 1985) (quoting *City of Montgomery v. Maull*, 344 So.2d 492, 495 (Ala. 1977)).

When it comes to determining the treatment of the County's proxy for depreciation and amortization, or as it is categorized as a reserve for depreciation, amortization, and future expenditures, the plain language of the Indenture excludes these from sums that are a reduction in revenues that are to be applied to pay items ahead of interest and principal to warrant holders. This is for two reasons. The first is that even if they are part of Operating Expenses, the distribution format of the Indenture, section 11.1 requires that for payment as Operating Expenses the items must have been both incurred plus due for payment. Indenture § 11.1. Nothing in this category is due for payment in the current month or in a prior month. If truly depreciation or amortization, the expenditures upon which they are premised may have already been paid. Again and by definition as a reserve for a future expenditures, nothing has been incurred in the current month or a prior one along with no payment being then due. This first reason arises from the distribution scheme of the Indenture, not from the details of what are Operating Expenses.

14

Under section 11.1, all System Revenues plus monies received by the County from certain swap agreements go into the Revenue Account, not just pledged special revenues. There is an exclusion of grants, borrowed sums, and some types of deposits from the mathematics of the distributive scheme, but they do not alter the Court's point or analysis. From the monies in the Revenue Account, exclusive of the referenced grants, borrowed sums, and deposits, only the Operating Expenses incurred and then due for payment are permitted to be paid in any given month. *Id.* After payment of these, the agreement of the County is that the remaining monies in the Revenue Account are to be paid in a prioritized order to various of the Indenture Funds. The fund to which monies are required to be paid after payable Operating Expenses is the Debt Service Fund. After that, the monies flow to other of the Indenture Funds or become Surplus Funds. At this time and for the anticipated life of this bankruptcy case, all of the parties agree that there will not be sufficient System Revenues to do anything more than pay the Operating Expenses and then a residual sum into the Debt Service Fund.

What all of this means is that even if the County is correct that the monies it wants to reserve are within Operating Expenses, they remain unpayable in the current month and, concomitantly, the revenues representing this withheld amount are required to be paid to the Indenture Trustee for the Debt Service Fund. It is from this fund that payments of interest and principal are remitted to the warrant holders. This is the contracted for distribution of monies under the Indenture and the remaining revenues after satisfaction of payable Operating Expenses in a given month must next be paid into the Debt Service Fund. Unless otherwise required or agreed, none of the monies in the Revenue Account are permitted to be held for a future use or for any purpose other than the distributions set forth in section 11.1. *Id.* Thus, that the reserve proposed by the County may or may not be an Operating Expense is irrelevant under the distributive schematic for the Revenue Account.[11]

The definition of Operating Expenses is the second reason the revenues reserved as a proxy for depreciation and amortization are not Operating Expenses. The Indenture's definition is quoted above in this subpart of this memorandum opinion. There are three kinds of Operating Expenses within this definition. Only two types are at issue. They are those that are either (a) reasonable and necessary expenses of efficiently and economically administering and operating the County's sewer system, or (b) expenses of maintaining the sewer system in good repair and in good operating condition. As a proxy for depreciation and amortization, the County's

---

[11] Due to this distribution framework, some of the revenues that could be distributed to the warrant holders may not be Pledged Revenues or, based solely on the Indenture, pledged special revenues for §§ 922(d) & 928(a) purposes. Those that the County argues are Operating Expenses in the form of reserves or estimates for various future expenditures or for depreciation or amortization would still be distributed on a monthly basis under section 11.1 of the Indenture. Under the Indenture, Operating Expenses are not part of the Pledged Revenues and, unless they are otherwise outside the Indenture pledged, they are not pledged special revenues under the Bankruptcy Code. This means those revenues that are distributed to the Debt Service Fund that are, under the County's argument, Operating Expenses, yet not payable, are potentially not pledged special revenues under §§ 922(d) & 928(a). If so, the result may be that § 928(b) would have no applicability to this portion of revenues paid to the Debt Service Fund. More simply, the County's argument that the withheld monies are within Operating Expenses could make § 928(b) unavailable as a method to alter the distributive flow of revenues under the Indenture.

15

withholdings for a reserve are expressly excluded from the portion of Operating Expenses that are for the efficient and economical administering and operating of the sewer system by the words "except depreciation, amortization."  Indenture § 1.1 at 9.

Somewhat akin to the exclusion of depreciation and amortization from the grouping for efficient and economical administering and operating of the sewer system is why the proposed reserve for these is not within the second type of Operating Expenses in dispute.  All of the parties agree that depreciation and amortization are operating expenses under generally accepted accounting principles.  Understanding how this treatment of depreciation and amortization comes into play under the Indenture and why the County's desired reserve is also not part of Operating Expenses is an instance where viewing the contract as a whole principle is important.  *See Vankini*, 57 So. 3d at 763.

The definition of Operating Expenses along with the distribution scheme of section 11.1 of the Indenture work together to create the mechanism by which all of the revenues from fees and charges generated by the sewer system plus certain other sources such as the Sewer Tax are placed into the Revenue Account from which are paid as Operating Expenses only those items for which a payment is actually made, not those for which one is not being made.  Fundamentally, the Indenture is designed to take all of the inflows of monies from all but a few sources not relevant to this discussion less those Operating Expenses for which an outflow of monies is called for in a given monthly period.  This structure is designed to get as much as possible of the hoped for positive cash flow to the Debt Service Fund and then, if revenues remain, to the other funds with a lower standing in the prioritization.  This is why depreciation and amortization are also not included within the expenses of maintaining the sewer system in good repair and good operating condition.  They are not expenditures.  Rather, they are positive cash flow items intended under the Indenture to be part of the total cash available which is reduced by only actual expenditures before payments to the Debt Service Fund.

Joined with seeing the Indenture's operational framework as a whole is the added factor that it is structured so that capital expenditures excluded from Operating Expenses are not paid for from monies placed into the Revenue Account unless sums placed via § 11.1 of the Indenture go into an Indenture Fund that permits such a use or, potentially, but not likely given the current finances of the sewer system, into Surplus Funds.  For excluded capital expenditures, the structure is that, if they are paid, it has to be from either borrowed monies that are held in one or more funds created as part of the sewer system's warrant indebtedness or from other sources, borrowed or not.  *See* Indenture Art. XI.  This treatment of capital expenditures is consistent with how the System Revenues are designed to be distributed.  The excluded capital expenditures are to ensure that the cash flow that is distributed under Article XI's scheme are not reduced by such capital acquisitions.  It is the overall structure of how inflows and outflows of monies under the Indenture that prevents reserves of the kind the County wants from being part of Operating Expenses.

16

## (2) Reports And Prior Actions

Evidence that this Court requested from the County and the Trustee to supplement what had been presented during the trial demonstrates this cash flow structure. It comes from years before any dispute between the County and Indenture Trustee occurred. It is how the County calculated what is defined in the Indenture as "Net Revenues Available for Debt Service." It is a calculation of funds that will be available during a given period for debt service. As part of a certification for the issuance of additional warrants, the County has been required to certify that required minimum levels of revenues would be available to repay in a given period interest and principal on the warrant obligations. Indenture §§ 10.2 (c) & (d), 10.2 (I)-(II). "Net Revenues Available for Debt Service" is defined as the total of System Revenues accrued plus interest earned on some of the Indenture Funds less Operating Expenses for the period involved. Indenture § 1.1 at 8.

Two reports from the certifying entity are part of the supplemented record. One is from March 2001 and the other is from September 2002. Both are from Paul B. Krebs & Associates, Inc. in the form of a report, a project overview, one exhibit for income and debt service coverage – a cash flow analysis for purposes of the Indenture – and a second exhibit setting forth the operations and maintenance expenses which are those defined as Operating Expenses under the Indenture (hereinafter individually the Krebs Report and collectively the Krebs Reports). The March 2001 Krebs Report covers the actual financial results for fiscal year 2000, the budgeted items for fiscal year 2001, and the forecasts for the same items for fiscal years 2002 through 2004. The September 2002 Krebs Report has a revised budget for fiscal year 2002 and revised forecasts for fiscal years 2003 through 2005.

On page two of the project overview of the 2001 Krebs Report and on page three of the project overview of the 2002 Krebs Report, the language is virtually the same: "For fiscal year ending . . . total operating expenses (as defined in the Trust Indenture) . . . amounted to . . . ." In other words, what these reports used as total operating expenses was the Indenture's Operating Expenses. On the same pages in the respective project overviews is language to the effect that in each of the prior years the sewer system has consistently "underrun" its operation and maintenance budget by a considerable margin. Footnote three in each of the Krebs Report's exhibit for operations and maintenance expenses reflects the operations and maintenance expenses as those incurred to carry on the normal day-to-day operation of the sewer system. The operations and maintenance expenses on the exhibits setting forth the cash flow are the same as the Operating Expenses under the Indenture. Between the two Krebs Reports, the Operating Expenses went from an actual amount for fiscal year 2000 of $36,109,000.00, which is the lowest amount for any fiscal year covered by the reports, to the highest amount for fiscal year 2005, a forecasted amount of $59,721,000.00. Neither of the Krebs Reports reflects a reduction in cash available for "Net Revenue Available for Debt Service" caused by depreciation, amortization, or a reserve for future expenditures.

Included with the Court's request for supplemental information was a historical record of

17

the actual financial results for the County's sewer system.  One of the documents supplied is a compilation, captioned "Jefferson County Sanitary Operations Fund Annual Financial Information," that is based on audited results for fiscal years 1997 through 2010 and unaudited for fiscal year 2011 and a partial fiscal year 2012.  Operating Expenses on this document reflect that the actual results for fiscal year 2000 were again the lowest amount at $36,000,000.00, and those for fiscal year 2010 were the highest at $58,900,000.00.  For the budgeted and forecasted fiscal years in the Krebs Reports, this compilation reflects that the actual, audited Operating Expenses did, in fact, "underrun" the budgeted and forecasted amounts by between under $2,000,000.00 for fiscal year 2001 to over $15,000,000.00 for fiscal year 2005.  The actual financial results for fiscal years 2000 through 2005 are consistent with what the Krebs Reports reflected was the historical result:  the budgeted and forecasted Operating Expenses were "underrun" by the sewer system.  Because the Krebs Reports did not include depreciation, amortization, and a reserve for future expenditures, and its budgeted and forecasted amounts for each fiscal year were less than the actual amounts, the comparison demonstrates that these fiscal years did not include as part of Operating Expenses the depreciation, amortization, or reserve that the County postulates.

This is made more evident by the audited amounts for Operating Expenses for fiscal years 2006 through 2010 and the unaudited amount for fiscal year 2011.  They range from a low in fiscal year 2011 of $50,000,000.00 to a high in fiscal year 2010 of $58,900,000.00.  Given the well over $100,000,000.00 per year depreciation for the most recent fiscal years reflected on the books of the sewer system as testified to by John S. Young, Jr., information acquired by him from the records of the sewer system while he served as the chief officer of the state court's receiver for the sewer system, it is apparent that the Operating Expenses for 2010 and 2011 do not include depreciation and amortization.[12]  Since there is no evidence that a calculated proxy for depreciation and amortization of the nature now proposed by the County has ever been utilized prior to its use to withhold revenues for December 2011, it is equally certain that such a proxy was not included in Operating Expenses for fiscal years 2010, 2011, or any other, earlier fiscal year.  Once more, the performance by the County under the Indenture shows that depreciation, amortization, a reserve for future expenditures, and a proxy for them have never been included as part of Operating Expenses.  They, therefore, have never been reductions in the determinations under the Indenture of revenues available for distribution under section 11.1, which are required to be paid over to the Indenture Trustee for the Debt Service Fund.

The analysis for what and how distributions are to be made under section 11.1 of the Indenture applies with equal strength to the County's reserve for professional fees and expenses.  It does not matter whether such a reserve is contained within Operating Expenses.  The revenues

---

[12]  This is not from Mr. Young's testimony in this adversary proceeding.  It is from his testimony during hearings held in November 2011 regarding, among other things, whether the bankruptcy case filed by the County dispossessed an Alabama court's receiver of possession and control over the County's sewer system.  The amount of depreciation was given as approximately $128,000,000.00 per year, which is consistent with the $128,000,000.00 to $130,000,000.00 figures used by the County in its January 2012 notification of withholding monies from the December 2011 and January 2012 distributions to the Indenture Trustee.

withheld for such a reserve were neither incurred in the current month, nor a prior one, and were not payable in the current month, nor a prior one. The outcome is the same whether or not they are within the definition of Operating Expenses. Because they are not payable in the current month, those revenues withheld for the estimate are still required to be distributed, after satisfying the payable Operating Expenses, to the Debt Service Fund. Indenture § 11.1.

As a result of ruling that the estimated professional fees and expenses are not to reduce the amount of revenues payable to the Indenture Trustee for the Debt Service Fund, the Court need not decide whether such professional fees and expenses come within Operating Expenses. It suffices to indicate that the Trustee's proposition is too broad should it be that all professional fees, be they legal, accounting, engineering, or other types, are not, due to having any relationship to the County's bankruptcy, within Operating Expenses. Added to this is that the Court has insufficient details regarding the composition of this category of expenditures to be able to rule on whether what the category is composed of is or is not, in whole or in part, within Operating Expenses.

### C. The Residual
### (1) Non-Recourse, Non-General–Limited vs. General
### And An Extension Curtailed

What remains to be discussed are certain arguments presented by the County regarding its view for how the Indenture treats a reserve for depreciation, amortization, and future expenditures along with the estimated professional fees and expenses. Despite many of the County's arguments being mooted by the analysis of the distributive scheme of section 11.1 of the Indenture, two need further attention. One is the category arising from reliance on the non-recourse, non-general nature of the County for the Indenture based obligations and the warrant indebtedness.

Its contention is that "any construction of the Indenture that imposes on the County an obligation to subsidize the operation of the System out of County funds beyond the System Revenues or encumbered Indenture funds would cross the boundary between limited and general obligations." County Trial Brief at 39. More pointedly, the County argues that such an outcome violates Alabama law and threatens the validity of the warrants. *Id.*

This argument has three prongs. One is section 224 of the Alabama Constitution, as amended by Amendment 342, which establishes a debt ceiling for counties in Alabama. The second is Alabama case law that interprets the Alabama Constitution's prohibition against municipal subdivisions, such as the County, from becoming indebted in an amount greater than five percent of the assessed value of property within the municipality. The third a legal extrapolation by the County of holdings in two Alabama cases, *Taxpayers & Citizens of Georgiana v. Town of Georgiana*, 93 So. 2d 493, 497 (Ala. 1956); *White v. Mayor of Decatur*, 23 So. 999, 1000 (Ala. 1898).

19

The law aspects of both the first and second prongs of the County's non-recourse, non-general obligation argument are undisputed. There is a limit to general obligation indebtedness set at five percent of the assessed value of properties within the County. However, the limit applies to general obligation indebtedness which, as already set forth, is not the type of obligation created by the Indenture or the warrants. Likewise and as the County concedes, payments by the County from non-sewer system revenues, including general revenues, do not count as an indebtedness for debt limit purposes when there is no mandatory obligation to make payments out of general revenues of the County. County Trial Brief at 40. The County cites in support of this *Chism v. Jefferson Cnty.*, 954 So. 2d 1058, 1078 (Ala. 2006).

At this point in the County's argument, a glitch occurs: it is the County's reading of the Trustee's position that its use of non-sewer system revenues to comply with obligations under the Indenture makes such a use an Indenture based contracted for obligation. This is not the case. Likewise, the County implicitly assumes that any such use by the County of non-sewer system revenues to avoid a default under the Indenture violates the debt limitations imposed on the County. This assumption is built into the County's argument despite its citation to Alabama authority for the proposition that a voluntary provision for payment of an operating expense is not an obligation that counts toward the limit on municipal indebtedness. *See, e.g.*, *Bankhead v. Town of Sulligent*, 155 So. 869, 871 (Ala. 1934); *Smith v. Town of Guin*, 155 So. 865, 868 (Ala. 1934).

Lastly for this argument, its third prong is an inapplicable extrapolation of Alabama decisions to the facts of this case involving a pledge limited for repayment purposes to only the revenues of the sewer system. The County uses a quote from *Town of Georgiana* to the effect that where principal and interest are payable out of the general revenues of a municipality, no part of the general revenues may be used to pay principal or interest until the current, legitimate municipal expenses are paid. *Town of Georgiana*, 93 So. 2d at 497. From this, the argument is extended without further citation of authority to reach this conclusion:

> Thus, under Alabama law, every pledge of municipal
> revenues–whether gross or net, whether recourse or not–
> is subject to the deduction of necessary expenses.

County Trial Brief at 41. The quoted extrapolation is not supported by *Town of Georgiana* or the case from which the *Town of Georgiana* quotes, *White*, 23 So. at 1000. In both of these cases, the Supreme Court of Alabama was discussing a pledge of general revenues of the municipality, not an obligation repayable from a source that is not the general revenues of the municipality. *Town of Georgiana*, 93 So. 2d at 497; *White*, 23 So. at 1000.

## (2) GASB 34

GASB 34 and three other GASB statements along with Financial Accounting Standards Board Statements, and Accounting Principal Board Opinions were the subject of hours of expert

testimony in the trial of this adversary proceeding. They are also the subject of numerous pages of exhibits. All of their usage has been mooted by the Court's discussion of the distribution framework of the Indenture. Even though mooted, an argument premised on GASB 34 warrants more discussion.

Under GASB 34, there is a modified approach for treatment of capitalized assets that are depreciated over their useful life. In certain circumstances, what are classified as infrastructure assets, such as a sewer system, are not required to be depreciated. Instead, all expenditures made for infrastructure assets that preserve, not those that add onto or improve, the infrastructure assets are to be expensed in the period in which they are incurred. The exclusions are additions and improvements to infrastructure assets that still must be capitalized. GASB 34 ¶¶ 18-26.

Despite conceding that the County has never used this modified approach, it argues that for purposes of determining Operating Expenses that it may now change from a depreciation regimen to the modified approach under GASB 34. One problem is the expert testimony evidences a serious question exists regarding whether the County would be able to meet the requirements for use of the modified approach during the pendency of its chapter 9 case. *See* GASB 34 ¶¶ 23-24. In particular, the evidence is that for some portions of its sewer system the necessary up-to-date inventory along with the requisite, measured condition assessments does not exist. *See* GASB 34 ¶ 23(a)-(b). Another is that the County's changing of its accounting methodologies does not mean that such a change may be the basis to alter the critical, fundamental bargain of the Indenture's lien and distribution structure. This is more true when one takes into account that the modified approach set out in GASB 34 was not adopted until after the Indenture was entered into by and between the County and the Trustee. A final difficulty is that to the extent the estimated monthly amount of $3,675,689.00 includes expenditures for items that extend, improve, or enhance infrastructure assets, the cost for such items may not be expensed under the GASB 34's modified approach. GASB 34 ¶ 25.

### IV. More Prior History

Before outlining the statutory provisions directly related to the County's and the Trustee's disagreement on both Operating Expenses and "necessary operating expenses," some discussion of one of this Court's earlier rulings is warranted. In a January 6, 2012, ruling, this Court held that the Pledged Revenues are special revenues under 11 U.S.C. § 902(2) and that they are pledged special revenues within the ambit of § 922(d). Section 922(d) provides that:

> Notwithstanding section 362 of this title and subsection (a) of this section, a petition filed under this chapter does not operate as a stay of application of pledged special revenues in a manner consistent with section 92[8] of this title to payment of indebtedness secured by such revenues.

21

As part of considering numerous arguments presented by the County and the Trustee, among others, this Court's January 6, 2012, order sets forth that:

> pledged special revenues as used in 11 U.S.C. § 922(d) includes all Pledged Revenues as defined in section 2.1 of the Trust Indenture . . . in the possession, custody, or control of The Bank of New York Mellon, John S. Young, Jr., LLC, or Jefferson Alabama, as of and on and after the filing of Jefferson County, Alabama's bankruptcy petition . . . .

It further sets forth that the "automatic stays of 11 U.S.C. § 362(a) and 11 U.S.C. § 922(a) do not operate as a stay of payment of [the] . . . Pledged Revenues pursuant to the terms and conditions of the Indenture." Jan. 6, 2012 Order, No. 11-05736-TBB-9 (Doc. 508) (hereinafter January 6, 2012 Order). In other words, continued payment of Pledged Revenues into the Debt Service Fund and the Reserve Fund, among other funds, and ultimately payment of interest and principal to warrant holders from the Debt Service Fund and the Reserve Fund, are not stopped by the automatic stays of the Bankruptcy Code, 11 U.S.C. §§ 362(a) & 922(a). A more detailed discussion of why this is the case is contained in this Court's earlier memorandum opinion. *In re Jefferson Cnty., Ala.*, 465 B.R. at 276-85.[13]

The ruling that the continued post-petition payment of the Pledged Revenues is not subject to the imposition of the automatic stays of 11 U.S.C. §§ 362(a) & 922(a) was conditioned on a potential complication should the parties not agree that Operating Expenses complies with the standard of "necessary operating expenses" of § 928(b). What was the possible complication has become one aspect of the dispute between the County and the Indenture Trustee and those that have joined with it in this adversary proceeding. It appears, at least in part, that the parties' impasse may have been caused by this Court's caveat that "[Pledged] Revenues may not be fully payable to the Indenture Trustee as a result of 11 U.S.C. § 928(b)" should the Indenture's definition of Operating Expenses be less than § 928(b)'s determination of "necessary operating expenses." *In re Jefferson Cnty., Ala.*, 465 B.R. at 286.

One of the reasons this was included in the memorandum opinion issued in conjunction with the January 6, 2012, order is that evidence had been presented indicating that during the Alabama state court receivership period some items of expense that might be part of Operating Expenses were being capitalized instead of being expensed. However and because the issues presented related to the applicability of the automatic stays of §§ 362(a) & 922(a) and whether pledged special revenues only included those special revenues in the possession of the Trustee as

---

[13] Portions of this Court's January 6, 2012, order and the associated memorandum opinion are being appealed by the County and the Trustee. One of the rulings appealed by the County is this Court's determination that the Pledged Revenues as pledged special revenues are not subject to the automatic stays of 11 U.S.C. §§ 362(a) & 922(a).

22

of the County's chapter 9 filing, insufficient evidence was presented regarding, and the focus of the parties' arguments was not directed at, whether payment of the Indenture specified Operating Expenses was being deviated from and whether such a deviation, if any, caused invocation of 928(b)'s "necessary operating expenses."

In other words, the focus was on whether the Pledged Revenues were all pledged special revenues under 11 U.S.C. § 922(d). It was not whether payment of Operating Expenses as determined under the Indenture avoids imposition of § 928(b)'s standard of "necessary operating expenses." This is some of why this Court deferred ruling on whether 11 U.S.C. § 928(b) altered the Indenture's distributive scheme for Pledged Revenues and reserved any such determination for a later time. The later time is now. It is also why a further review of some of the relevant sections of the Bankruptcy Code is needed.

## V. The Codifications[14]
### (A) All Are Special, But Not All Are Pledged

The portions of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, that are directly involved in resolution of the dispute over the flow of System Revenues are § 902(2) defining special revenues, § 922(d) limiting the breadth of the automatic stays of §§ 362(a) and 922(a), § 928(a) preserving certain pre-bankruptcy consensual liens, and § 928(b) potentially causing revenues subject to such preserved liens to be used to pay a category of operating expenses before payments on obligations secured by a lien on special revenues. An outline of each helps understanding of the issues raised by the County and the Trustee.

This Court has held that the Pledged Revenues are special revenues as defined in 11 U.S.C. § 902(2). *In re Jefferson Cnty., Ala.*, 465 B.R. at 286-87; January 6, 2012 Order. However, it has not so ruled with respect to all of the System Revenues. Special revenues is defined as including:

(A) receipts derived from the ownership, operation, or

---

[14] Courts have used various frameworks to assign the burden of proof in bankruptcy cases. Some cases, such as *In re Romagnolo*, have looked beyond the pleadings and allocated the burden of proof according to the nature of relief sought. *Romagnolo v. United States (In re Romagnolo)*, 190 B.R. 946, 947 (Bankr. M.D. Fla. 1995) (placing the burden of proof on the government regarding the dischargeability of a tax debt even though the debtor had commenced the declaratory action); *see also Hillsborough Holdings Corp. v. Celotex Corp. (In re Hillsborough Holdings Corp.)*, 166 B.R. 461, 468 (Bankr. M.D. Fla. 1994) (placing the burden of proof on the party seeking to pierce the corporate veil even though the debtor had commenced the declaratory action). Within this framework, the County bears the burden to show 11 U.S.C. § 928(b)'s application because the County has withheld System Revenues and would therefore bear the burden of proof regardless of the procedural posture of this adversary proceeding. Likewise, other courts, such as this Court in *In re Stone*, have recognized that the burden of proof is placed on the party claiming an exception in a statutory provision. *Stone v. Stone (In re Stone)*, 199 B.R. 753, 780-81 (Bankr. N.D. Ala. 1996) (citing *Hill v. Smith*, 260 U.S. 592, 595 (1923)). Within this framework, the County bears the burden because it is attempting to invoke the "necessary operating expense" exception in § 928(b). Regardless of the method of analysis, the County bears the burden of proof on this issue.

23

> disposition of projects or systems of the debtor that are
> primarily used or intended to be used primarily to provide
> transportation, utility, or other services, including the
> proceeds of borrowings to finance the projects or systems;
> (B) special excise taxes imposed on particular activities
> or transactions;
>
>       \*    \*    \*
>
> (D) other revenues or receipts derived from particular
> functions of the debtor, whether or not the debtor has
> other functions; or
> (E) taxes specifically levied to finance one or more
> projects or systems, excluding receipts from general
> property, sales, or income taxes . . . levied to finance the
> general purposes of the debtor.

11 U.S.C. § 902(2).  For the County's sewer system, all of the monies in this application of payment dispute are special revenues within the portions of § 902(2) quoted.

     This arises from the Indenture definition of System Revenues encompassing revenues derived from (a) the sewer system's operations and the Sewer Tax along with (b) interest earnings on monies held by the Bank of New York Mellon and the County in certain of the sewer system's accounts including those for some of the Indenture Funds.  Indenture § 2.1.  A comparison of what comprises System Revenues with the definition of special revenues reveals that each of these categories of System Revenues is within § 902(2)'s specification of special revenues.  *Compare* 11 U.S.C. § 902(2), *with* Indenture §§ 1.1 & 2.1.  Added to this is that no evidence has been presented that indicates that the System Revenues include sums that are not special revenues.  At this juncture in the pendency of the County's chapter 9 case, the majority of special revenues and System Revenues at issue are those received by the sewer system as monthly fees, deposits, and charges paid by users of the sewer system.

     Although there is an earlier discussion of 11 U.S.C. § 922(d) in the context of the Pledged Revenues, more is warranted to assist understanding the outcome of use of System Revenues for Operating Expenses versus their inclusion as Pledged Revenues.  The wording of this subsection is:

> (d) Notwithstanding section 362 of this title and
> subsection (a) of this section, a petition filed under
> this chapter does not operate as a stay of application
> of pledged special revenues in a manner consistent
> with section 92[8] of this title to payment of
> indebtedness secured by such revenues.

11 U.S.C. § 922(d).  Even though § 922(d) is a debarment of the automatic stays of 11 U.S.C.

§§ 362(a) & 922(a), it is a limited one. It only prevents the staying of "application of pledged special revenues" to payment of debts secured by such revenues. The § 922(d) limitation on the reach of the automatic stays does not apply to all special revenues. It is only for those that are pledged. 11 U.S.C. § 922(d).

Because System Revenues as defined in the Indenture are greater in amount than Pledged Revenues, § 922(d)'s restriction on the stays of 11 U.S.C. §§ 362(a) & 922(a) is only with respect to the Pledged Revenues. One cautionary note is required. This referenced restriction of the automatic stays is when the lien status is viewed solely from the Indenture's treatment for what are Pledged Revenues. Even though all of the System Revenues are special revenues, Pledged Revenues is the only portion of System Revenues that, when considered only by how they are treated under the Indenture, constitutes "pledged special revenues." *In re Jefferson Cnty., Ala.*, 465 B.R. at 484-85. This means that what is to be paid under the Indenture as Operating Expenses does not involve consideration of § 922(d)'s limitation on the automatic stays should no other lien or pledge exist. Nor does a determination of Operating Expenses viewed only from the Indenture's treatment of them involve the 11 U.S.C. § 922(d) limitation of its reach created by the language that application of pledged special revenues be "in a manner consistent with section 92[8] of this title to payment of indebtedness secured."

The significance, in this case, is that what this Court has called the further restriction on the ambit of 11 U.S.C. § 922(d), the post-bankruptcy consensual lien requirement of 11 U.S.C. § 928(a) and the "necessary operating expenses" standard of 11 U.S.C. § 928(b), does not apply to the System Revenues expended for Operating Expenses should the Indenture be the only pledge/lien creating vehicle. Operating Expenses from such a vantage point would be neither Pledged Revenues under section 2.1 of the Indenture, nor pledged special revenues for 11 U.S.C. § 922(d)'s purposes. This contorted discussion is created by the deferral to another day of the existence, or not, of another pledge or lien against the revenues of the County's sewer system. Conceptually and despite this overly complex lien discussion, what are Operating Expenses under the Indenture needs to achieve what § 928(b) was designed to ensure. To ascertain whether this is the case, § 928(b)'s purpose and its applicability to special revenue financing must be understood.

### (B) Why The Necessary
### (1) The Problems, The Corrections, And The Wanting Of Clarity

In 1988, legislation was enacted to amend portions of chapter 9 of the Bankruptcy Code, 11 U.S.C. §§ 901 *et seq.* The enactment was the Municipal Bankruptcy Amendments of 1988, H.R. 5347, and S. 1863, from the 100th Congress, 2d session (hereinafter sometimes the 1988 Amendments). Section 922(d) and § 928(a) & (b) were added to chapter 9. 11 U.S.C. §§ 922, 928. Since the 1978 passage of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, the use by municipalities of what is called special revenue financing has expanded exponentially. Under this sort of financing, a lien is frequently not obtained against the properties that generate revenues such as a water or sewer system or other governmental projects. Due to the laws of

many states, a municipality may be prohibited from granting a lien against its system's or project's physical assets that generate the revenues to secure repayment of monies borrowed to finance, among other purposes, the construction, rehabilitation, expansion, or improvement of a project or system. Even where there may not be such a prohibition, state statutory or constitutional limits on municipal debt may still preclude the granting of such a lien. To avoid one or both of these restrictions, what has been and continues to be utilized as collateral to secure repayment of monies borrowed is one or more of the revenues generated from operation of the project or system and certain types of tax revenues. H.R. REP. NO. 100-1011 (1988) at 4 (hereinafter the House Report); S. REP. NO. 100-506 (1988) at 6-7 (hereinafter the Senate Report).[15] In part, getting around these limitations is why Jefferson County borrowed for its sewer system's needs using special revenue financing of this sort.

One of the special revenue financing related concerns that developed following the October 1, 1978, enactment of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, which over time was accentuated by increased municipal use of special revenue financing, was the impact of 11 U.S.C. § 552 on pre-bankruptcy security agreement created liens against property of a debtor or a debtor's estate. Simplistically in a bankruptcy case, § 552 was viewed as, at least arguably, stripping in a municipal bankruptcy the pre-bankruptcy liens created under a security agreement with respect to the revenues generated by a municipality's project or system.

This arises from how § 552 was drafted, which was from the perspective of commercial transactions, not municipal financing. Liens obtained pursuant to a security agreement from a debtor before a bankruptcy is filed covering both a particular property plus any proceeds, profits, offspring, products, and rents, among others, from the property are, if within what § 552(b)(1) & (2) call for, continued as liens against the proceeds, profits, offspring, products, and the like in the after bankruptcy filing period. 11 U.S.C. § 552(a) & (b); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 374 (1988). Obtaining a consensual lien against the property from which revenues are generated along with one against the proceeds, profits, offspring, products, rents, and other revenues of similar kind in a commercial financing transaction was and is a generalized practice.

Since in the municipal special revenue financing context, there is often no lien on the underlying property comprising the project or system, many were concerned that 11 U.S.C. § 552(b)'s requisites for the post-bankruptcy preservation of a pre-bankruptcy consensual lien on proceeds, profits, and products, to name a few, are not met in many municipal government special revenue financing transactions and § 552(a) remained a vehicle for the stripping of a pre-bankruptcy security agreement created lien. This was perceived as a possible outcome of § 552(b)'s requirement for the post-bankruptcy preservation of a consensual lien: a pre-bankruptcy lien had to have been obtained against both the underlying property and the proceeds,

---

[15] These are, respectively, the House of Representatives Committee on the Judiciary Report on H.R. 5347 (100th Congress, 2d Session) and the Senate Committee on the Judiciary Report on S. 1863 (100th Congress, 2d Session).

profits, products, etc.  11 U.S.C. § 552(a) & (b); Senate Report at 5-7; House Report at 4-5. Thus, the need for 11 U.S.C. § 928(a).  Senate Report at 5-7; House Report at 4-5.

It is the first subsection of 11 U.S.C. § 928 that preserves pre-bankruptcy created consensual liens against special revenues.  It reads:

> (a) Notwithstanding section 552(a) of this title and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before commencement of the case.

11 U.S.C. § 928(a).  The § 928(a) referenced subject to subsection (b) language reads:

> (b) Any such lien on special revenues, other than municipal better assessments, derived from a project or system shall be subject to the necessary operating expenses of such project or system, as the case may be.

11 U.S.C. § 928(b).  As already mentioned, "necessary operating expenses" is undelineated in the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*  Not having more than the words "necessary operating expenses" creates an ambiguity regarding what these words envelop.  "Necessary" may be defined with meanings ranging from something that is absolutely needed to something that is needed, but not essential.  Sometimes its usage means essential and other times it may mean basic.  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 776 (10th ed. 1969); J.I. RODALE, THE SYNONYM FINDER 769 (1978); OXFORD ENGLISH DICTIONARY (3d ed. 1993; online version 2012).

Depending on its usage, the "necessary operating expenses" of a system or project may range from only those absolutely required for the operation of the system or project to those important to the operations, but not absolutely essential.  These differences in what may be "necessary's" usage in § 928(b) involve a matter of degree and timing.  The scope to which either or both of these aspects are part of "necessary" is unarticulated in the bankruptcy statute.  For instance and at any given time, what is "necessary" as "operating expenses" may include all "operating expenses" or only some depending on whether "necessary" is only those absolutely necessary in the then period of time versus being those needed, yet deferrable to a later period.  In this case, some of what is viewed as "necessary" by the County and not seen as so by the Trustee arise from the temporal aspect of "necessary's" usage.  Similarly, "operating expenses" under § 928(b) could be in its accounting sense or it may not have the meaning an accountant would attribute to it.  It, too, has a time facet even if it is not used as an accountant would.  These are some of the difficulties inherent in the § 928(b) usage of "necessary operating expenses."

27

When words of a statute are susceptible to multiple meanings or interpretations, it is appropriate for a court to look to the legislative history of a statute to try to ascribe the intended meaning to such a statutory usage of words. *United States v. Great N. Ry.*, 287 U.S. 144, 154–55 (1932) (observing that the process of statutory construction when a meaning is uncertain involves recourse to legislative history "of the measure and the statements by those in charge of it during its consideration by the Congress"). So, too, when there are no court decisions answering a particular question of law, it is appropriate for a court to review legislative history to ascertain the drafters' intent. *Hi-Tech Pharm., Inc. v. Crawford*, 544 F.3d 1187, 1190-91 (11th Cir. 2008). It is for these reasons that this Court references the legislative history for the 1988 Amendments.[16]

### (2) Resort To Legislative History And Gleaning An Overall Purpose

This Court's review of the legislative history for the 1988 Amendments is divided into two general categories. One is to learn the overall purpose for the portions of the 1988 Amendments at issue in this case. The other is to delve into the specifics of the what and why of the amendments as they relate to the post-bankruptcy retention of a lien on special revenues. This format is used because sometimes the specifics fog over the overall purpose(s) thereby letting the effects of the technical changes hide the purposes(s) underlying the amendments.

The legislative history includes the report of the Committee on the Judiciary submitted for Senate Bill, S. 1863, and the report of the Committee on the Judiciary submitted for H.R. 5347. It is from these substantially identical bills that the 1988 Amendments emerged. The report for S. 1863 sets forth that:

> The purpose of the bill is to clarify the provisions of
> the Bankruptcy Code applicable to municipalities and
> to correct unintended conflicts that currently may
> exist between municipal law and bankruptcy law. The
> proposed amendments reflect principles that have
> long been the premise for municipal finance but
> have not been expressly stated in the Bankruptcy Code.
> The proposed amendments would dispel the confusion
> which has resulted from the general statement of Section
> 901 of the Bankruptcy Code that Sections 547, 552, and
> 1111(b) are currently applicable to a Chapter 9 case. Those
> sections were originally drafted with regard to corporate and
> individual bankruptcies and incorporated by reference
> in Section 901 of the Bankruptcy Code. Their effect on a
> municipal bankruptcy due to the unique nature of municipal

---

[16] In *In re Jefferson Cnty., Ala.*, 465 B.R. at 281-86, a more detailed discussion of the 1988 Amendments is set forth than is presented in this memorandum opinion.

28

finance was never considered by the drafters of the
Bankruptcy Code.

Senate Report at 1-2. The report of the Committee on the Judiciary of the House of
Representatives shows that the purpose for H.R. 5347 was identical to that underlying S. 1863.
House Report at 2-5. In the words contained in the report for H.R. 5347, it "remedies the
inconsistencies between bankruptcy law and principles of municipal finance to remove the
potential for problems that now exist." House Report at 3. Unfortunately, reference to these
parts of the legislative history only discloses in a generalized way the purpose undergirding the
sections in the 1988 Amendments contested here. To know the particular purpose for them
requires more searching.

Although the potential for lien negation on post-bankruptcy property acquired by a debtor
or a bankruptcy estate under 11 U.S.C. § 552(a) has been discussed, the consequences beyond
just the loss of the security interest have not. Likewise, § 552's interrelation with two other parts
of the Bankruptcy Code that were principal focuses for eliminating inconsistencies between
municipal and corporate finance and avoiding unintended consequences has not been considered.
The two other portions are the preference avoidance section, 11 U.S.C. § 547, and the one
making nonrecourse obligations recourse in certain instances, 11 U.S.C. § 1111(b). House
Report at 4-5. Each of these was altered with respect to a municipal debtor's special revenue
financing transactions. *See* 11 U.S.C. §§ 926(b) & 927.

The bigger picture of what was to be accomplished by the 1988 Amendments comes from
knowing that the post-bankruptcy loss of a security interest in pledged special revenues via
§ 552(a) or the § 547 avoidance of a payment to a bond or warrant holder pursuant to a special
revenue financing could have made the obligation or avoided transfer unsecured. As an
unsecured indebtedness, it was then potentially repayable from the general revenues of the
municipal entity. Under this scenario, it might have been changed by the pre-1988 version of the
Bankruptcy Code from an obligation repayable solely from the revenues of the system or project
or a specified tax into one repayable from the general revenues of the municipality. Essentially,
it may have been turned from a nonrecourse into a recourse obligation of the municipal
government. Elimination of § 1111(b)'s allowing some nonrecourse obligations to be treated as
recourse was part of the correction. Section 926(b)'s making transfers of a municipal debtor's
property "to or for the benefit of any holder of a bond or note, on account of such bond or note"
unavoidable under § 547 was another. So, too, was the § 928(a) post-bankruptcy preservation of
consensual, pre-bankruptcy petition security interests in special revenues. 11 U.S.C §§ 926(b),
927, 928; House Report at 5; Senate Report at 12-13.

Without these changes, any conversion of nonrecourse obligations to recourse along with
any repayment of them from general revenues rather than a specified revenue source that is not
the general revenues of the municipality could have caused violations of a state law or
constitution imposing limits on debt. These are two of the specifics of the 1988 Amendments,
which were designed to forestall what might have otherwise happened to harm a municipal entity

29

debtor. All were designed to retain in a bankruptcy case how special revenue financing had been structured outside a bankruptcy case. House Report at 4; Senate Report at 12-13.

At the same time, the legislative history reflects that Congress intended to protect special revenue financing lenders in specific ways. Section 928(a)'s security interest preservation prevents municipal entities from being able to use pledged system or project revenues for non-system or non-project purposes. This is also one of the factors desired to be achieved by limiting the preference avoidance capabilities of § 547 when it comes to special revenue financing. House Report at 4-5, 7; Senate Report at 5, 8-9. A driving reason underpinning alteration of the applicability of § 552(a) in municipal bankruptcy cases was, in the wording used in the Senate's report, "to ensure that revenue bondholders receive the benefit of their bargain with the municipal issuer and that they will have unimpaired rights to the project revenues pledged to them." Senate Report at 12. Earlier in the same report, the "benefit of their bargain" is explicitly described:

> [I]n the municipal context, the benefit of the
> bargain is solely the revenues from the project and
> never the full faith and credit of the municipality.

Senate Report at 9. The provisions of § 928 in conjunction with the definition of special revenues in § 902(2) "protects the lien on revenues." *Id.* As important, is that:

> it [§ 928] was not intended to create new rights that
> otherwise would not exist under state law and constitutional
> provisions. The proposed amendment only removes
> that limitation [§ 552(a)'s lien avoidance] in the
> circumstances described in proposed Section 92[8](a).

Senate Report at 12-13.

These quoted portions from the legislative history relating to the specifics are indications that 11 U.S.C. § 928 was not intended to enhance in a bankruptcy case the rights of the parties to special revenue financing agreements that do not already exist under a jurisdiction's laws and constitution. A corollary to this must be that existing rights under state law and constitutional provisions including those designed to enforce what the parties to a contract agreed to are to be unaltered by the 1988 Amendments unless clearly done and accomplished within what federal laws and the Constitution allow. All of this demonstrates that what was being done by the 1988 Amendments was altering portions of the Bankruptcy Code that would have potentially changed the pre-bankruptcy structure of special revenue financing. Put another way and with one potential exception, § 928(b), Congress passed amendments that were designed to keep the framework of special revenue financing unaltered by the provisions addressed by the 1988

Amendments.[17]

There is another indication that this is the case. For instance and while discussing when the automatic stays of 11 U.S.C. §§ 362(a) & 922(a) are not to interrupt the application of pledged special revenues to payment of secured bonds after payment of operating expenses, what the parties call a net revenue pledge, the following is set forth in the report of the United States Senate Committee on the Judiciary:

> The automatic stay should specifically be inapplicable
> to application of such revenues. The Bankruptcy Court
> could retain the power to enjoin application of proceeds,
> however, upon a specific showing of need, for example,
> where a secured creditor was about to apply proceeds of a
> **gross revenue pledge** in a [manner] inconsistent with
> policies of the proposed new section.

Senate Report at 11 (emphasis added). The report of the U.S. House of Representatives Committee on the Judiciary is more explicit on what are the "policies of the proposed new section." Its language is:

> [N]ew subsection (d) to section 922 states that the
> automatic stay of Bankruptcy Code section 362
> does not operate to stay paying pledged revenues,
> consistent with new section 92[8] of the Bankruptcy
> Code, to the revenue bondholders holding liens on
> such revenues.

House Report at 7. What this shows is that Congress contemplated leaving a pledge of special revenues unaffected unless it is at odds with the policies incorporated in § 928. In particular, this is discussed in the context of a gross revenue pledge, again, one on all special revenues, not a pledge of revenues remaining after payment of the requisite operating expenses, a net revenue pledge. At a minimum, this supports that Congress's concept is that certain revenue pledges are to be left as contracted for so long as they are implemented in a manner consistent with what was contemplated by the drafters of the 1988 Amendments.

What was envisioned to happen first is the use of special revenues to keep the system or project operating followed by payment of interest and principal to lenders. This is discernable from the following:

---

[17] This should not be read to mean that, if applicable, other sections of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, not changed by the 1988 Amendments may not be available to modify the contractual relations between parties to municipal special revenue financing agreements.

31

New subsection 928(b) ensures that in the case of
. . . system financing (such as financing
improvements to a local electric distribution system
by debt secured by a lien on revenues of the **entire**
system), the lien on special revenues will be subordinate
to the necessary operating expenses of the project or
system.

Senate Report at 8 (emphasis added). Virtually the same language is contained in the report of
the U.S. House of Representatives Committee on the Judiciary for when the contracted for lien
would be subordinated to expenses of the system or project. It sets forth that "[a]n example of
system financing would be the financing of improvements to a local electric distribution system
secured by a **lien on revenues of the entire system**." House Report at 23 (emphasis added).
Both reports reference a lien on all special revenues of a system that is a gross revenue pledge.
These indicate that the concern was with gross revenue pledges, not net revenue pledges that are
truly net revenue pledges.

Still more support for the intended purpose of the 1988 Amendments, to leave special
revenue financing unchanged by §§ 547, 552, & 1111(b), exists. Perhaps the most striking is the
discussion in the Senate's report that indicates why the amendments may not be required, but are
being made to eliminate any future contest over whether these sections of the Bankruptcy Code
can be utilized to alter the distributive scheme of monies that was created outside bankruptcy for
special revenue financing. It is:

In the municipal context, therefore, the simple
answer to the Section 552 problem is that Section 904
and the tenth amendment should prohibit the inter-
pretation that pledges of revenues granted pursuant to
state statutory or constitutional provision to bondholders
can be terminated by the filing of a chapter 9 case.
Likewise, under the contract clause of the Constitution
(article I, section 10), a municipality cannot claim that
a contractual pledge of revenue can be terminated by
the filing of a chapter 9 proceeding. However, the
significant uncertainties under current law make
clarification of the law necessary.

Senate Report at 6-7 (citations omitted). This is recognition by the drafters of the 1988
Amendments that serious, legitimate legal justifications exist for why a pre-bankruptcy pledge of
special revenues enforceable under state laws may not and should not be undone by the then
existing statutory provisions made the subject of the 1988 Amendments. It is also support for the
purpose of Congress: to prevent a bankruptcy filing from altering special revenue financing
transactions via 11 U.S.C. §§ 547, 552, & 1111(b). Using a different terminology, the overall

32

goal was to retain as much as possible the pre-bankruptcy status of pledged special revenue financing transactions involving municipalities.[18]

Even more credence that this is the overall purpose of the 1988 Amendments is revealed by a discussion of adding 11 U.S.C. § 927 to the Bankruptcy Code. "New section 927 leaves the legal and contractual limitations of revenue bonds and state law intact without altering Bankruptcy Code provisions with respect to nonrecourse financing." House Report at 7.

Not altering the pre-bankruptcy status of a pledge of special revenues upon the filing of a municipal bankruptcy that might have occurred via then existing §§ 547, 552, & 1111(b) is also recognized by proponents of the 1988 Amendments as the purpose for changing the application of these sections when it comes to special revenue financing. A review of the *Report of the National Bankruptcy Conference on Proposed Municipal Bankruptcy Amendments* (hereinafter the NBC Report) reflects that those desiring the 1988 Amendments sought them for the purpose for which they were enacted and that the 1988 Amendments were enacted with only minor changes to the language proposed by the National Bankruptcy Conference. This National Bankruptcy Conference report was part of the floor speeches of the two members of Congress who introduced the bills in their respective chambers. *See* 133 CONG. REC. S16229-S16234 (daily ed. Nov. 12, 1987) (Floor Speech of Sen. DeConcini); 134 CONG. REC. H596-H601 (daily ed. Feb. 2, 1988) (Floor Speech of Rep. Edwards).

All of this demonstrates that, subject to one qualification, the purpose for the changes to §§ 547, 552, & 1111(b) brought about by the 1988 Amendments was to make clear that retention of the pre-bankruptcy lien status of pledged special revenues should occur in a municipal bankruptcy. This includes leaving intact the priority of payment of monies to those whose claims have been secured by a consensual lien against special revenues. There is no indication in either the bankruptcy statute or the legislative history for the 1988 Amendments that municipal debtors were to be given the ability through § 928(b) to significantly restructure the contractual agreements for the lien against special revenues or the distribution of monies to secured creditors. Quite the contrary is the case. The Senate Report makes this clear:

> The intent of Subsection (b) [of § 928] is not to change the priority and intent of the use of the special revenues under the terms of the municipal debt financing documents.

Senate Report at 23.

---

[18]  Again, this is only with respect to the specific sections addressed by the 1988 Amendments. It does not mean that other sections of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, may not be available to otherwise alter aspects of pledged special revenue transactions involving municipalities. *See, e.g.*, 11 U.S.C. §§ 363(c)-(e), 506(c), 901(a), & 1129(b)(1)-(b)(2)(B).

33

It is unmistakable that protection against use of §§ 547, 552, & 1111(b) to change municipal special revenue financing terms, including the lien against special revenues, is a critical part of achieving the overall purpose of the 1988 Amendments. The overall purpose was to keep such special revenue financing transactions unaffected by the sections of the Bankruptcy Code amended by the 1988 Amendments. The maintenance of the status quo post-bankruptcy is potentially subject to a limited subordination for certain operating expenses under § 928(b). Keeping this overall purpose in mind allows one to understand more of when and how the 11 U.S.C. § 928(b) exception operates.

### (3) When, What, And Scope Of The Necessary
### A/K/A Not Impairing The Bargain And What Should Not Be Done
### (a) During A Case

When 11 U.S.C. § 928(b) comes into play in a municipal bankruptcy is an initial issue comprised of a time element and a standard component. The time element is technically during the pendency of a case from its filing up to confirmation of the municipality's plan of adjustment of debts. *Compare* 11 U.S.C. § 928, *with* 11 U.S.C. § 944. This means the time of § 928(b)'s subordination is measured in months to, hopefully, not more than a few years. The point is that it is not permanent. It is designed to keep the system or project operating pending a final resolution of a municipal bankruptcy case.

The second facet of when involves § 928(b)'s standard of "necessary operating expenses," which is more complex. As the following discussion illustrates, this complexity evidences some of why the Trustee argues for application of § 928(b)'s subordination only for gross revenue pledges.

### (b) The Standard Is Also A Factor With Other Items And An Unknown
### (i) The Known

Examination of the legislative history helps knowing some of what are the "necessary operating expenses" of § 928(b). The standard is its most important aspect and is one of the factors for delineating what are items within "necessary operating expenses." The standard is keeping the system or project operating to generate monies to repay the lenders and to deliver the intended service to customers. House Report at 8; Senate Report at 22 (referring to the costs and expenses "necessary to keep the project or system going and producing special revenues"). In the words of the drafters:

> This is important because **payment** of operating expenses–those necessary to keep the project or system going–must be protected so that the project or system can be maintained in good condition to generate the reve[n]ue to repay bondholders (and, importantly, to provide residents of the municipality

34

with the service the project or system is meant to
deliver).

House Report at 8 (emphasis added). Additionally, they must be "necessary and directly related
to the project or system generating the special revenues and are not the expenses of the
municipality generally or for other systems or projects." Senate Report at 23. Section 928(b)'s
reach is a limited one. It is not inclusive of all operating expenses. That this is the case is
expressed in both the House Report and the Senate Report using identical words:

> Subsection (b) sets forth a **minimum** standard
> for **paying** operating expenses ahead of debt service
> where revenues are pledged. It is not intended
> to displace any broader standard contained in the
> terms of the pledge or applicable non-bankruptcy
> law.

Senate Report at 23; House Report at 8 (emphasis added). The identical wording in both of these
reports happens to be taken verbatim from the NBC Report. NBC Report at 29-30.[19] Of
particular note in the legislative history and the NBC Report is that the discussion in each for
what is within § 928(b)'s minimum standard includes items that are to be paid, not those that are
not. The bolded "payment" and "paying" portions of the immediately preceding quotations
relating to keeping the system operating and the minimum standard are each with respect to items
that are to be paid.

From this legislative history, the following is part of the perimeter of what is contained
within § 928(b)'s "necessary operating expenses." It includes for a given period of time those
that are (1) expended to keep the system or project operating in the sense that the system or
project is kept in good repair and generating the special revenues, not improvements or
enhancements, (2) directly related to the project or system, not unrelated, (3) some, but not all
operating expenses, which flow from § 928(b) being a minimum standard, and (4) being paid,
which is different from those that may be incurred and paid in a later time period. Senate Report
at 22; House Report at 8; NBC Report at 21-24, 29-30.

### (ii) The Unknown Not Included

Whether there may be another item within the boundary of what is "necessary operating
expenses" remains to be discussed. It is expenditures for items that under generally accepted

---

[19] In addition to this portion, large parts of the Senate Report and the House Report are word for word the
same as what is in the NBC Report.

35

accounting principles are for capital items.[20]  This category is raised by the County as a basis for including certain of the items that are disputed by the Trustee.  The County cites the NBC Report as support for capital expenditures being within "necessary operating expenses."  The precise language is:

> Moreover, the phrase "operating expenses" should not be construed to exclude capital expenses or expenditures, because they may be as necessary as ordinary operating expenses to maintain the source of revenue from which bonds are to be paid.

NBC Report at 24.  Despite this language being in the NBC Report, which was partially read into the record by Senator DeConcini along with S.1863 on November 12, 1987, 133 CONG. REC. at S31824, and fully read into the record along with H.R. 3845 by Representative Edwards on February 8, 1988, 134 CONG. REC. at H600, it is not contained in the Senate Report or the House Report.  Each of these reports was submitted in September 1988, which is months after the NBC Report was made part of the record on introduction of the two bills in the respective chambers of the Congress of the United States.  Senate Report at 1 (dated September 12, 1988); House Report at 1 (dated September 30, 1988).

Furthermore, a careful review of the NBC Report where the discussion of capital expenses and capital expenditures is set forth reveals that it was in the context of a gross revenue pledge, not a net revenue pledge.  *See* NBC Report at 21-24; 134 CONG. REC. at H599-H600; 133 CONG. REC. at S31824.  As part of the discussion of this topic, the NBC Report includes this:

> In very general terms, a net revenue pledge would survive, and a gross revenue pledge would be treated as if it were a net revenue pledge.

NBC Report at 22; 134 CONG. REC. at H599; 133 CONG. REC. at S31824.  Because (a) the capital expenses/capital expenditures verbiage quoted is not in either the Senate Report or the House Report despite their extensive, verbatim inclusion, without citation, of large parts of the NBC Report, and (b) the NBC Report's contents on these classifications is in the context of a gross revenue pledge, it is, at best, questionable whether the legislative history supports inclusion of capital expenses/capital expenditures as part of "necessary operating expenses" for pledges of special revenues**.**

Another complicating factor is that the content of what the NBC Report references as capital expenses/capital expenditures is subject to debate.  For instance, no indication is given

---

[20]  The Court's reference to generally accepted accounting principles is for more certainty in distinguishing between capitalized versus non-capitalized expenditures.  It is not to be read as an indication that § 928(b) incorporates generally accepted accounting principles.

36

regarding whether these expenditures are for fixed assets, which should be distinguished from expenditures for items that may be capital expenditures, but not for fixed assets. It may also be that what is being referenced is a relatively small dollar amount expended for what is a capital item that may be expensed under a *de minimis* standard. This reference may also be to items that under accounting principles are truly expenses, but large in dollar amount. In fact, it may be that what the NBC Report classifies as capital expenses or capital expenditures does not have the meaning one would attribute to them under generally accepted accounting principles. None of this is known or knowable from the contents of the NBC Report. What is known is that there is no inclusion of this portion of the NBC Report in either the Senate Report or the House Report and the subordination discussion for § 928(b) occurs in the context of gross revenue pledges, not net revenue pledges. Senate Report at 8-9, 22-23; House Report at 7-8.

Under case law for the use of legislative history, this is just the situation when no significance should be accorded to what was excluded from both the Senate Report and the House Report. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119-20 (2001) ("Legislative history is problematic even when the attempt is to draw inferences from the intent of duly appointed committees of the Congress. It becomes far more so when we consult sources still more steps removed from the full Congress . . . ."); *Kelly v. Robinson*, 479 U.S. 36, 50-51 & n.13 (1986) ("[N]one of those statements was made by a Member of Congress, nor were they included in the official Senate and House Reports. We decline to accord any significance to these statements."). This Court does the same. Accordingly in this County-Trustee fight, expenditures for items that are capitalized are not included within the scope of "necessary operating expenses."

### (c) The Reserve Is Excluded

Even more significantly, unbridled inclusion of costs that under generally accepted accounting principles are capitalized, whether in the context of a gross revenue or a net revenue pledge, is capable of undoing what the 1988 Amendments were designed to prevent.[21] In this case, an expansion of "necessary operating expenses" as posited by the County eviscerates the protections for pledged special revenues that have been codified by the 1988 Amendments. The County's reserve portion causes a reduction in monies that would otherwise be distributed to the warrant holders in the magnitude of $3,675,689.00 per month from what they had been under the Indenture's formula. The fact that there is insufficient evidence for how much of the reserve is for the acquisition of capital items is immaterial: the County's notification letters make the calculated reserve a proxy for depreciation and amortization. It is not for the sort of day-to-day expenses required to keep the sewer system operating for the relatively short time between the filing of the County's bankruptcy and a final resolution of its case.

As a substitute for what is the actual depreciation and amortization, it is not within "necessary operating expenses" because it does not represent the payment of any monies for a

---

[21]  *See supra* note 20.

current operating expense. Depreciation and amortization are recognition as an operating expense, in a current period, of a portion of an expenditure that was made in a prior period. As such, they are not current expenditures of monies that under any definition of "necessary operating expenses" keeps the sewer system operating. They are not an expenditure, let alone one that is being paid in a given period. Under one of the known factors for what is within "necessary operating expenses," that a cost or an expense actually be paid, the reserve is for this additional reason not part of "necessary operating expenses."

Over the course of a year, these sorts of County urged allocations could reduce monies that would otherwise be applied as pledged special revenues by tens of millions of dollars. Should this Court accept the County's view of § 928(b), the reduction in payments over the life span of this case could be in an aggregate sum well in excess of $100,000,000.00 from what it otherwise might be.

If the legislative history for the 1988 Amendments demonstrates nothing else, this is not what was intended by, nor contemplated for, § 928(b). In effect, adopting the County's view as the standard embedded in § 928(b) allows an end run around what was the overall purpose for the 1988 Amendments. This occurs because it would significantly alter the agreed scope of the lien against special revenues along with the contracted for distribution of pledged special revenues to a degree beyond what the legislative history indicates was the purpose of the 1988 Amendments. This is why keeping focused on the overall purpose for the 1988 Amendments is critical. Failure to do so in this case could lead to a result not embraced by Congress, nor made part of the 1988 Amendments. Although this is one aspect for why the County's proposed application of § 928(b) and its perception of what should be included within "necessary operating expenses" is incorrect, another exists.

### (C) Mutuality and Business Judgments

All of the factors, what is ascertainable and unknown, and the problems with fixing the precise contents and contours of "necessary operating expenses" militate against any item-by-item determination by a court of those costs and expenses that make up "necessary operating expenses." This view is enhanced when one recognizes the variability of municipal projects and systems. Some may be entirely new with little initial maintenance or repairs. Others may be partly new with greater maintenance and repairs needed than that required by a completely new project or system. Many will implicate technical areas with respect to which judges and lawyers have little knowledge and even less real world experience. The degree in variation of what may be minimally required among projects and systems to achieve the purpose underlying § 928(b) is potentially exponential. These are some of why the business judgment rule has been adopted by courts, *see Fed. Deposit Ins. Corp. v. Stahl*, 89 F.3d 1510, 1517 (11th Cir. 1996), and is why this Court will not be inveigled into doing any item-by-item type of analysis for § 928(b). Such a review is also unnecessary in this case because a pledge of all of the special revenues from the County's sewer system is not at issue.

38

This leaves determining what is considered the sort of pledge of special revenues that is immune from application of 11 U.S.C. § 928(b)'s subordination. What is known in this case is that the Pledged Revenues do not constitute a gross revenue pledge. It is a pledge of System Revenues left following payment of Operating Expenses. *See supra* Part III.A. Along the continuum of types of pledges from what is a net revenue pledge to that which is a gross revenue pledge, it is easy to know whether a particular one is at the point where a gross revenue pledge is found. Somewhere on the other side of the continuum may be found a net revenue pledge of the sort that allows absolutely all possible operating costs to be paid ahead of principal and interest. How pledges in between these two points are to be dealt with for § 928(b)'s purposes is not as readily evident. This is especially true when for 11 U.S.C. § 928(b)'s purposes neither type of pledge is mentioned by name. *See* 11 U.S.C. §§ 902(2), 922(d), 926, 927, & 928.

Joined with this is that a rule like that espoused by the Trustee – that § 928(b)'s subordination does not come into play unless a gross revenue pledge is involved – is susceptible to manipulation. For instance, one might pledge revenues of a system or project that pays some operating expenses, but leaves less than the minimum amount needed to pay "necessary operating expenses" under any fixing of what its standard may be. This is why what is contemplated as "necessary operating expenses" needs to be considered along with what the Indenture defines as Operating Expenses. Otherwise, clever drafting of a special revenue pledge may take it out of being a gross revenue pledge, yet leave insufficient monies to fund the operation of the system or project to the extent Congress contemplated by its 1988 Amendments.

This potentiality may also be why the NBC Report's wording is that "**[i]n very general terms**, a net revenue pledge would survive, and a gross revenue pledge would be treated as if it were a net revenue pledge." NBC Report at 22 (emphasis added); 134 CONG. REC. at H599; 133 CONG. REC. at S31824. Even if it is not, this quote from the NBC Report is a foundation upon which the Trustee asserts that § 928(b) is only applicable to a gross revenue pledge. As the NBC Report's "very general terms" wording demonstrates, its footing is not the absolute that it is argued to be.

Recalling once more the overall purpose of the 1988 Amendments and the standard set by § 928(b) allows one to learn how they work in harmony. What this Court has identified as the overall purpose is leaving pledges of special revenues in municipal special revenue financing transactions unaltered unless a pledge would cause a system or project to fail to meet the minimum for § 928(b)'s subordination to be invoked. The standard is that which allows a project or system to be in good condition to enable it to keep "going" to "generate revenues to repay bondholders" and to provide the services to the system's or project's customers. House Report at 8; Senate Report at 23. It is not a standard that requires the best conditions, it is not one that contemplates that all possible costs of operation should be incurred, and it is not one that was designed to supercede the overall purpose of the 1988 Amendments other than in a lowest denominator sort of way. *Id.*

It is a minimal standard designed with the types of pledges in mind that would not allow

Case 12-00016-CRJ    Doc 151    Filed 10/09/12    Entered 10/09/12 11:57:55    Desc Main
Document    Page 39 of 43

payment of operating expenses needed to keep the system "going." House Report at 8; Senate Report at 23. Unless there is another source of revenues dedicated to pay operational costs of the system or project, gross revenue pledges certainly fail to comport with this minimum. When it comes to pledges of special revenues that allow payment of at least some operating expenses ahead of debt, the consideration should be whether the contracted for pledge allows the system during the pendency of the municipal bankruptcy to continue to operate, be in good condition, and generate revenues for debt repayment. It is not that it is the best possible operation, the best maintained, or the best of any category of possible criteria.

Because pledges that are of the type allowing payment of operating expenses ahead of principal and interest secured by special revenues are negotiated by and between the municipality and the lender, pledges of this sort entail the business judgments of both parties regarding, among other factors, consideration of the needs for keeping the project or system operating and in good condition, and able to serve both the customers' and the lender's needs. In the structuring of special revenue based borrowing, all of these are of concern to both sides of the transaction. The municipality needs the system to remain in a condition that allows it to serve the purpose for which the project or system was designed and for it to generate the requisite revenue to fund the system's/project's day-to-day operations and timely payment of debt service. Concomitantly, the lender is concerned that the system remain in good condition so that it will generate sufficient revenues to enable it to be repaid timely. At the time of formulating the pledge of special revenues and the distributive format for them, the municipality and the lender have a commonality of interests exercised by the terms incorporated into the contracts between them.

It is this mutual exercise of business judgment that is incorporated into a special revenue financing transaction that should not be second guessed in a municipal bankruptcy absent clear evidence of an unreasonable exercise[22] or that it is a certainty that the § 928(b) standard is not met. *See Stahl*, 89 F.3d at 1517. In other words, for pledges that are not gross revenues, a court should defer to the agreed to pledge and distributive design representing the business judgments of the parties that is expressed in the contract between them. *See, e.g., In re Pomona Valley Medical Group, Inc.*, 476 F.3d 665, 670 (9th Cir. 2007) ("We have never had the occasion to define the contours of the business judgment rule in the bankruptcy context. However, courts are no more equipped to make subjective business decisions for insolvent business than they are for solvent businesses, so we have no difficulty concluding that its formulation in corporate litigation is also appropriate here."); *Stahl*, 89 F.3d at 1517; *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985) (recognizing the applicability of the business judgment rule in the bankruptcy context); *Hensley v. Poole*, 910 So. 2d 96, 104 (Ala. 2005). In its essence, this format preserves the overall purpose of the 1988 Amendments and

---

[22] Any determination of "unreasonableness" should be based on the case law standards for when a court does not allow the business judgment rule to preclude further inquiry. *See, e.g., Fed. Deposit Ins. Corp. v. Stahl*, 89 F.3d 1510, 1517 (11th Cir. 1996); *In re Pomona Valley Medical Group, Inc.*, 476 F.3d 665, 670 (9th Cir. 2007); *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985); *Hensley v. Poole*, 910 So. 2d 96, 104 (Ala. 2005).

implements the 11 U.S.C. § 928(b) standard as the legislative history indicates it should be done.

This procedure simultaneously allows a court to avoid item-by-item comparisons of costs and expenses associated with operating a system or project about which it will know little, if anything at all. Although to a lesser degree than for other types of bankruptcy cases, *see* 11 U.S.C. §§ 901(a), 903, & 904, it also minimizes use of § 928(b) as a possible means to avoid other sections of the Bankruptcy Code that have more fully developed parameters and requirements. *See, e.g.*, 11 U.S.C. §§ 364(c)-(e) & 901(a). Once more knowing that this is the case requires keeping forefront the overall purpose sought to be achieved along with the limited application that § 928(b) is to be accorded.

### (D) The Certainty: § 928(b) Does Not Apply

The Indenture, including the various supplemental indentures, defines Operating Expenses to include (1) all reasonable and necessary expenses of efficiently and economically administering and operating the County's sewer system, (2) the expenses of maintaining the sewer system in good repair and good operating condition, and (3) fees and charges of the Indenture Trustee. It excludes (1) depreciation, amortization, and interest and payments on certain swap agreements, (2) expenditures that are under generally accepted accounting principles properly chargeable to a fixed capital account when they are for maintaining the sewer system in good repair and in good operating condition, and (3) expenditures that are extraordinary items under generally accepted accounting principles when they are for administration and operation of the sewer system. By way of example, the Indenture sets forth as part of its definition of Operating Expenses a nonexclusive listing of items included. This listing is for the costs of "all items of labor, materials, supplies, equipment (other than equipment chargeable to fixed capital account), premiums on insurance policies and fidelity bonds . . . fees for engineers, attorneys and accountants (except where chargeable to fixed capital account) and all other items . . . ." Indenture § 1.1 at 9. So long as those items within Operating Expenses are both incurred in the current month or prior one and due for payment, they are to be paid in the then current month. Indenture § 11.1. The Indenture's Operating Expenses is quite broad and is designed to allow the County's sewer system to continue to operate to meet the requisite operating expenses.

The review by application of the business judgment rule is one in gross, not particulate. The Indenture payment scheme for Operating Expenses is one that the parties agreed would be sufficient to keep the County's sewer system in good operating condition and good repair. This Court need not second guess that determination for § 928(b)'s application. Even more, what was agreed to in the Indenture has enabled the sewer system to keep operating along with payment of all of the Operating Expenses plus payments of interest and principal on the warrants. The evidence is clear that this has been the case for the over fifteen years the Indenture's calculation of Operating Expenses has been utilized to determine what costs and expenses were to be paid.[23]

---

[23] The Court is not unmindful of the numerous criminal convictions involving previous Jefferson County commissioners, former employees of the County, and businesses and employees of businesses involved in the sewer

For application of § 928(b) purposes, any deficiency in revenues to pay obligations beyond the Operating Expenses and the monies actually paid toward the warrant obligations is complicated by the County's not raising sewer system rates or otherwise increasing sewer system revenues since 2008. More basically put, some of the inability of the sewer system to meet its Indenture obligations is the result of not having revenue enhancements, be it by rate increases or otherwise. This is yet one more reason for why this Court should not go behind what was agreed to in the Indenture. To do otherwise would allow a special revenue financing borrower to use a default in a revenue enhancement obligation, i.e., a rate adjustment requirement, to justify imposition of § 928(b). The outcome of all of this is that 11 U.S.C. § 928(b) is inapplicable as a means to subordinate the 11 U.S.C. § 928(a) preservation of the pledge of special revenues under the Indenture. As a result, the Pledged Revenues are to be paid by the County to the extent and as required under the terms of the Indenture to the Indenture Trustee.[24]

## VI. Overview Revisited–Case Summary

The overview of this Court's ruling is that the Operating Expenses as determined under the Indenture do not include (1) a reserve for depreciation, amortization, or future expenditures, or (2) an estimate for professional fees and expenses. At the end of each monthly period, as is determined under the Indenture, the monies remaining in the Revenue Account following payment of the Operating Expenses that were (1) incurred in the then current month or any prior month and (2) due and payable in the then current month or a prior month are to be remitted in

---

system's projects and the funding for its projects. However, no evidence has been presented that overrides the fifteen year track record under the Indenture resulting in payment of the sewer system's costs and expenses in a fashion that has allowed it to operate to serve its customers and pay principal and interest, to the extent paid, to warrant holders.

[24] This is also a case in which a particulate comparison would yield the same outcome. In outline form, the definition of Operating Expenses includes all of the day-to-day expenses for, not just the operation and administration of the sewer system, but also those added ones required to make it operate both efficiently and economically. Likewise, it includes all of the day-to-day expenses of maintaining the system in good repair and in good operating condition, not just the necessary ones. Depreciation and amortization are excluded as they are from "necessary operating expenses" under this Court's ruling. Even though possibly less than the amount of the capital expenditures excluded from "necessary operating expenses," the same is the case when it comes to capital expenditures chargeable to a fixed capital account. They are excluded from "necessary operating expenses" and Operating Expenses. The interest and payments made for certain qualified swap agreements have nothing to do with sewer system operations, administration, or maintenance. They are monies used to meet obligations under swap agreements that were purportedly designed to mitigate the effect of interest rate swings, not expenditures even remotely related to the day-to-day operations of the sewer system. Excluding consideration of extraordinary items from Operating Expenses, this comparison evidences that the Operating Expenses to be paid under the Indenture is a higher one than the minimum envisioned for § 928(b). Should the $833,333.00 per month for estimated professional fees and expenses not be the extraordinary items the Trustee asserts and not be capitalized, they would come within the definition of Operating Expenses. If they are extraordinary items, they would still be excluded from Operating Expenses and "necessary operating expenses" as estimated sums, not sums being paid in a current period. As a capitalized expenditure, this sum would not count as an Operating Expense or a "necessary operating expense." Either way, the Operating Expenses to be paid within a given month exceed the minimal standard of § 928(b).

42

the priority and manner as set forth in Article XI of the Indenture without withholding of any monies for depreciation, amortization, reserves, or estimated expenditures that are the subject of this litigation.  Additionally, 11 U.S.C. § 928(b) is inapplicable to the pledge of revenues under the Indenture and the distributive scheme in Article XI of the Indenture.  A separate order incorporating this Court's rulings will be entered.

**Dated:**     **October 9, 2012**

**Thomas B. Bennett**
**United States Bankruptcy Judge**

43